UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Jessica L. Ecock-Rotondo, Ph.D.,                    Index No. 6:23-cv-6166

                          Plaintiff,

           v.

Rochester Institute of Technology,                  **COMPLAINT**

                          Defendant.

---

Plaintiff, Dr. Jessica L. Ecock-Rotondo by and through her attorney, J. Morgan Levy Firm, PLLC by way of Complaint against defendant Rochester Institute of Technology, alleges as follows:

## INTRODUCTION

1. This is an action seeking declaratory relief as well as monetary damages, to redress defendant's violations of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., (herein after "NYSHRL"), the Americans with Disabilities Act, 24 U.S.C. § 12100, et seq., (herein after "ADA"), and Title IX of Education Amendments Act, 20 U.S.C. § 1681 et seq., (herein after "Title IX").

2. Specifically, defendant violated Title IX and the NYSHRL when it discriminated against plaintiff on the basis of her sex and gender and violated the NYSHRL when it discriminated against her on the basis of race when it hired a less qualified, black man for a position she, a more qualified, white, female woman, also sought and applied for.

3. Defendant also violated NYSHRL and the ADA by permitting retaliatory harassment of plaintiff and by retaliating against plaintiff by failing to promote her after she complained about her supervisor's disability discrimination and harassment of another employee.

4. This is also an action for breach of contract for RIT's failures to abide by its own policies and procedures for responding to complaints of harassment and discrimination (*see* Exhibit 1, RIT C06.0 Policy Prohibiting Discrimination, Harassment and Retaliation) and its policies and procedures for staff recruitment and hiring (*see* Exhibit 2, RIT Hiring Manager Information and Staff Recruitment policies) and its Code of Ethical Conduct and Compliance (*see* Exhibit 3, RIT C00.0.)

5.  Defendant's unlawful conduct was knowing, malicious, willful, and wanton and/or showed a reckless disregard for plaintiff's protected rights and has caused and continues to cause plaintiff to suffer substantial economic and non-economic damages.

## THE PARTIES

6.  Plaintiff Dr. Jessica L. Ecock-Rotondo is an individual residing in the town of Batavia, in the State of New York.

7.  Upon information and belief, defendant RIT is a private educational institution and employer located at One Lomb Memorial Drive in the town of Henrietta, State of New York.

## JURISDICTION AND VENUE

8.  This court has jurisdiction over all claims made pursuant to Title IX pursuant to 28 U.S. Code § 1331.  Plaintiff requests this court exercise supplemental jurisdiction over her claims made pursuant to NYSHRL pursuant to 28 U.S. Code § 1367.

9.  Venue is proper in this court pursuant to 28 U.S. Code § 1391 (b) because defendant's principle place of business is in Monroe County.

## FACTS COMMON TO ALL CAUSES OF ACTION

10. Rochester Institute of Technology (hereinafter "RIT") is a not-for-profit university describing itself as a "diverse and collaborative community of engaged, socially conscious, and intellectually curious minds."[1]  In speaking of its commitment to diversity, RIT highlights its "social and educational dynamic not found at any other university" in connection with RIT's National Technical Institute for the Deaf.[2]

11. RIT employs around 4,000 faculty and staff and is an employer as defined by NYSHRL and the ADA.

12. RIT is also an educational institution as defined by 20 U.S.C. § 1681 (c) and receives federal funding making it subject to Title IX.

---

[1] https://www.rit.edu/about-rit; last accessed August 29, 2022
[2] Id.

### Dr. Ecock-Rotondo's RIT Career
### First Five Years

13. Dr. Ecock-Rotondo, was hired as Associate Director in the Center for Student Conduct and Conflict Resolution (hereinafter "the Center") at RIT in January 2013.  At all relevant times mentioned herein, Dr. Ecock-Rotondo was an employee of RIT.

14. Upon Dr. Ecock-Rotondo's acceptance of RIT's offer of employment, a contract existed between RIT and Dr. Ecock-Rotondo.

15. The terms and conditions of this contract were spelled out in Dr. Ecock-Rotondo's offer letters and in the employee policies and procedures articulated by RIT including, but not limited to the policies and procedures including in Exhibits 1-3.

16. In exchange for Dr. Ecock-Rotondo's work for RIT, RIT provided her a base salary and contributions to her retirement income, life insurance, health insurance and other benefits.

17. A few years after she began at RIT, Dr. Ecock-Rotondo was given supervisory responsibility for Mr. Dave Graupman, an individual hired for a new Conduct Coordinator position in the Center.

18. In 2018, Mr. Joe Johnston, then director of the Center, transitioned to another role at RIT. Upon his transition, Dr. Ecock-Rotondo was asked to, and did, serve as interim director of the Center, although she was not paid for this increase in responsibility.

19. While interim director of the Center, Dr. Ecock-Rotondo hired and supervised another new employee, Mr. Greg Beattie, a Deaf person.

20. Upon his hire, Dr. Ecock-Rotondo requested a "strobe light" for the fire alarm in the Center's office as well as other accommodations he required as a Deaf person.

21. In or around July 16, 2018, Dr. Ecock-Rotondo applied for the director position in the Center.

22. She was not hired as the director.

23. Instead, Dr. Nicole Boulais, Associate Vice President, a supervisor at RIT and the supervisor of the director of the Center position, hired Ms. Jennifer Newell, an individual with 15 more years of experience in higher education than Dr. Ecock-Rotondo.

24. In explaining why Dr. Ecock-Rotondo was not selected for the role, Dr. Boulais explained Dr. Ecock-Rotondo needed "a few more years' experience" before she could be considered qualified for the director position.

25. Although Dr. Ecock-Rotondo clearly met the minimum qualifications for the director position, she understood why someone with so many more years of experience could be hired for the role over her.

**Ms. Newell's Treatment of Mr. Beattie**

26. The minimum job qualifications for the director of the Center position include "Knowledge of Deaf culture, American Sign Language (ASL), or willingness to learn."

27. Ms. Newell, who began in the director role in or around September 2018, did not possess this knowledge or skill.

28. Ms. Newell also never learned ASL while director of the Center despite her access to free ASL and Deaf culture learning opportunities through the Faculty and Staff Sign Language program.

29. Ms. Newell's failure to learn ASL or about Deaf culture despite it being a job expectation, was even more problematic given the Center's employment of a Deaf individual, Mr. Beattie.

30. Unfortunately, Ms. Newell's failure to consider Mr. Beattie's Deafness was a prominent and lasting feature of her leadership of the Center.

31. Ms. Newell's lack of skill in this area became apparent early on at a holiday party in December 2018 when Ms. Newell arranged for Center staff and two interpreting staff to play a "white elephant" gift exchange game in which gifts are randomly selected by players. Normally, players in a white elephant game each bring a gift to exchange, however, Ms. Newell did not tell the staff about the game prior to the party and brought all seven presents for the exchange herself. Two of the presents purchased by Ms. Newell for the staff were revealed to be Bluetooth speakers. When the speakers were unwrapped, participants became very uncomfortable, realizing Ms. Newell's lack of consideration for Mr. Beattie's unlikely use of this "gift".

32. As Ms. Newell's lack of consideration for Mr. Beattie continued into the new year, Dr. Ecock-Rotondo began to advocate for him in earnest.

33. In example, on January 4, 2019, Ms. Newell, who became Dr. Ecock-Rotondo's supervisor upon her hire, asked Dr. Ecock-Rotondo for ideas for how the office could be improved. Dr. Ecock-Rotondo provided Ms. Newell several suggestions, including;

   (a) Ms. Newell consider spending time in the Center's office space during the day (because Ms. Newell's office was down a hall from the rest of the Center staff's office space.)

   (b) Ms. Newell have monthly one-on-ones with two other staff members in the office, whom Dr. Ecock-Rotondo supervised.

(c)   Ms. Newell learn ASL.

34. After this meeting, Ms. Newell accepted Dr. Ecock-Rotondo's suggestion in paragraph 33(b) above as it relates to Mr. Graupman, meeting with him every three weeks starting in January 2019. Ms. Newell did not, however, similarly hold such meetings with Mr. Beattie, although Mr. Graupman and Mr. Beattie held the very same position; "Conduct Coordinator."

35. During this time period, Dr. Ecock-Rotondo observed Ms. Newell treating Mr. Beattie as if he were a child, speaking to him in a demeaning manner. In example, Ms. Newell told Mr. Beattie he could not ride his bicycle anymore after he was injured in a minor biking accident on his way to work. Ms. Newell also told Mr. Beattie several times that he could not have babies, while never making this comment to other staff members.

36. Dr. Ecock-Rotondo also observed Ms. Newell's refusal to treat Mr. Beattie as a competent staff member because of his Deafness. In example, on at least two occasions in July 2019, Ms. Newell asked Dr. Ecock-Rotondo to arrange for another staff person to be present in the office with Mr. Beattie, explaining she did not want Mr. Beattie to be in the office alone. When asked why Mr. Beattie would not be able to be alone in the office, Ms. Newell explained it was because

(a)   he could not answer phones,

(b)   he would be scared if someone "surprised him" in the office,

(c)   he would be unable to communicate with hearing students who may come in, and

(d)   he had asked why there was not a strobe light in the office to alert him to fire alarms.

37. Dr. Ecock-Rotondo was taken aback by Ms. Newell's apparent biases towards Deaf people and assured her Mr. Beattie was fully capable of working in the office in every way hearing people worked in the office. Additionally, Dr. Ecock-Rotondo noted that she requested a strobe light for Mr. Beattie upon his hire, but it had not been installed. She suggested Ms. Newell follow up on the request.

38. Ms. Newell's bias against Mr. Beattie continued in 2020. In example, in or around the summer of 2020, on more than one occasion, Ms. Newell told Dr. Ecock-Rotondo she may need to remove Mr. Beattie's oversight of the "Advocate Program", specifically stating Mr. Beattie may not be able to "handle" the updates needed due to changes in the Title IX regulations. Once again Dr. Ecock-Rotondo was surprised by Ms. Newell's biases, given Mr. Beattie had solely managed the Advocate Program for two years, making many improvements to the Program and receiving praise for his work from his colleagues. Whenever Ms. Newell brought this topic up to Dr. Ecock-Rotondo she vigorously pushed back, reminding Ms. Newell he was an exceptional leader of the program. It seemed clear to Dr. Ecock-Rotondo Ms. Newell was equating Mr. Beattie's Deafness with a lack of intellect.

39. Dr. Ecock-Rotondo also observed subtle differences in the manner Ms. Newell treated Mr. Beattie, like for example, how during the 2020-2021 academic year, Ms. Newell regularly

wrote individual comments directed toward Mr. Beattie in the Center's group chat, rather than in direct messages which is how she communicated with all other employees.

40. In March 2021 Dr. Ecock-Rotondo once again noticed Ms. Newell's discriminatory behaviors towards Mr. Beattie when Ms. Newell asked Dr. Ecock-Rotondo to lead a Code Review Committee Dr. Ecock-Rotondo suggested Mr. Beattie lead it instead. Ms. Newell declined, stating she did not want Mr. Beattie to lead it because she needed it done quickly; implying Mr. Beattie was slow. Dr. Ecock-Rotondo once again pushed back on Ms. Newell's assumptions regarding Mr. Beattie remarking he should be given the opportunity to experience a code review process. While Ms. Newell eventually acquiesced to Dr. Ecock--Rotondo's suggestion, Ms. Newell appointed a co-chair alongside Mr. Beattie so Mr. Beattie didn't have full authority over the committee.

41. Additionally, in May and June 2022, Mr. Beattie was not invited to serve on the search committee for the Center director position despite Mr. Graupman, a hearing person in the exact same role as Mr. Beattie, having served on the previous director search committee in 2018. In fact, no Deaf or Hard of Hearing employees served on this 2022 director search committee.

**Retaliatory Harassment**

42. While Dr. Ecock-Rotondo was eager to help Ms. Newell become fully incorporated into the office, Ms. Newell began treating Dr. Ecock-Rotondo with increased hostility shortly after the early 2019 conversation in which Dr. Ecock-Rotondo suggested Ms. Newell learn ASL. From this point forward Ms. Newell's treatment of Dr. Ecock-Rotondo shifted from open and welcoming to dismissive and demeaning and ultimately to outwardly hostile and aggressive.

43. Around February 2019, Ms. Newell moved into Dr. Ecock-Rotondo's office, presumably in connection with Dr. Ecock-Rotondo's suggestion in paragraph 33(a), above. Soon after, Ms. Newell began to refer to Dr. Ecock-Rotondo as her "roommate" in conversations with Dr. Ecock-Rotondo and others, rather than using Dr. Ecock-Rotondo's name.

44. About a month later, on March 27, 2019, Ms. Newell shouted, "fuck you!" at Dr. Ecock--Rotondo and picked up a tissue box gesturing as if she would throw it at Dr. Ecock-Rotondo but refraining from releasing the box at the last moment. This expletive was shouted in response to Dr. Ecock-Rotondo replying positively to news of an RIT attorney's plans to attend a student Title IX proceeding scheduled for a few hours later.

45. While Dr. Ecock-Rotondo has had undergraduate students facing serious disciplinary consequences swear at her from time to time, she has never experienced a colleague or supervisor swearing at her; unsure how to react, Dr. Ecock-Rotondo responded by uncomfortably laughing.

46. In addition to Dr. Ecock-Rotondo and Ms. Newell, Ms. Tammy Brongo and Ms. Amelia Lombardo (a student worker) witnessed this encounter, prompting Ms. Brongo to ensure that Ms. Lombardo knew the behavior she witnessed was not appropriate, stating this is not how an office works.

47. In another example, on June 25, 2019 (during a Title IX retreat) Ms. Newell approached Dr. Ecock-Rotondo stating "come here, Jessica," put her arm around her neck and squeezed, causing discomfort to Dr. Ecock-Rotondo's neck.  Upon information and belief Mr. Graupman was present for this exchange.

48. Around this time, Ms. Newell began threatening to remove Dr. Ecock-Rotondo's supervisory responsibilities.

49. On August 1, 2019, Mr. Beattie told Ms. Newell he would like to move into an office Mr. Graupman had vacated, explaining he wanted an office where he could position himself to see the front door of the Center and to provide him more light.[3]  Mr. Beattie was clearly asking Ms. Newell for an accommodation for his disability.

50. Ms. Newell responded to Mr. Beattie's request with anger; her face turned bright red, and she stated in an angry tone that she would not be deciding who would move into the office at that time.

51. Immediately after Mr. Beattie made this request, Ms. Newell followed Dr. Ecock-Rotondo into their office; closed the door demanding to speak with to Dr. Ecock-Rotondo; however, Dr. Ecock-Rotondo told her a call was being transferred in and she could not speak with Ms. Newell at that moment.

52. Before Dr. Ecock-Rotondo and Ms. Newell could talk, Dr. Ecock-Rotondo and Mr. Beattie spoke.  Dr. Ecock-Rotondo tried to explain Ms. Newell's bizarre reaction by saying Ms. Newell might have felt as if she were being challenged by his questions as he was more direct than usual.  Mr. Beattie said he would set up a meeting with Ms. Newell to discuss his concerns.  Later, Ms. Newell told Dr. Ecock-Rotondo she was upset because Dr. Ecock-Rotondo did not warn her Mr. Beattie wanted the office.  Dr. Ecock-Rotondo had not known Mr. Beattie wanted the office until he made his request.

53. The following Tuesday, August 6, 2019, Ms. Newell was still upset about Mr. Beattie's request and yelled at Dr. Ecock-Rotondo telling her, she knew Dr. Ecock-Rotondo and Mr. Beattie had a meeting the day before he made his request and accusing Dr. Ecock-Rotondo of having prior knowledge of Mr. Beattie's request.  Despite Dr. Ecock-Rotondo having already told Ms. Newell that she was unaware Mr. Beattie would be asking about moving his office, it was clear Ms. Newell believed Dr. Ecock-Rotondo had been attempting

---

[3] Because Mr. Beattie utilizes his sight to communicate through ASL and written communication it is important to have adequate light for his vision.  In Mr. Beattie's existing office at this time, he was unable to see the front door of the Center office suite; making it impossible for him to assess if someone entered.

to support his request for an accommodation and was angry about it.  Ms. Newell's voice was raised, and her tone was condescending during this conversation.

54. Ms. Newell's anger and persistent frustration about a colleague asking to move into an open office to accommodate his disability was extremely distressing to Dr. Ecock-Rotondo.  She informed Ms. Newell that Mr. Beattie would set up a one-on-one meeting to further discuss his needs with her.

55. During this same exchange, Ms. Newell told Dr. Ecock-Rotondo she wanted to wait to determine office assignments after Mr. Graupman was replaced, because she wanted to hire someone "with a lot of experience, like Dave" and give them the office, rather than Mr. Beattie.

56. Ms. Newell's perspective of Mr. Beattie's experience was faulty.  Ms. Newell appeared to find Mr. Graupman more experienced than Mr. Beattie because he "supervised" Residential Life staff (15 people) in relation to their conduct work and Mr. Beattie did not "supervise" anyone else.  This, however, ignored Mr. Beattie's oversight of the Advocate Program (which, at times, had close to 100 trained faculty and staff members.)

57. Additionally, Mr. Graupman did not actually have much more experience than Mr. Beattie, as Mr. Beattie completed a professional internship with the Center while working full-time for another office.

58. When Dr. Ecock-Rotondo raised the points in paragraphs 56-57, above, Ms. Newell raised her voice again, balled her fists and stared at Dr. Ecock-Rotondo for approximately twenty seconds; an uncomfortably long time period.  Dr. Ecock-Rotondo was incredibly confused by the extreme anger demonstrated by Ms. Newell's volume and body language during this exchange; it appeared to Dr. Ecock-Rotondo that Ms. Newell wanted to hit Dr. Ecock--Rotondo.  Dr. Ecock-Rotondo, now nervous for her safety, said, "I don't know what you want from me," which ended the interaction.

59. Later, Ms. Newell told Dr. Ecock-Rotondo the conversation with Mr. Beattie went well and on August 16, 2019, Ms. Newell said Mr. Beattie could move into the open office "temporarily".

60. Unfortunately, Ms. Newell's disregard for Mr. Beattie's needs continued, including on September 17, 2019, when Ms. Newell scheduled a three-hour training for Title IX hearing officers but neglected to schedule an interpreter, making the event inaccessible to Deaf participants, including Mr. Beattie.

61. While waiting for a substitute interpreter to arrive (who never did), Dr. Ecock-Rotondo left the office to visit the restroom.  Shortly thereafter Ms. Newell entered the same bathroom and the stall immediately next to the one occupied by Dr. Ecock-Rotondo.  Ms. Newell stood in the stall next to Dr. Ecock-Rotondo's stall for some time, without seeming to ever use the

restroom.  Dr. Ecock-Rotondo felt uncomfortable that this was happening and stayed in the stall she occupied until Ms. Newell finally left the other stall and the bathroom.

62. When Dr. Ecock-Rotondo returned to her office, Ms. Newell entered, shut the door, stood in front of it, facing the door, holding the door closed with both hands for the entire interaction. She turned her head to Dr. Ecock-Rotondo and stated in a low and angry tone, "I guess I have to take responsibility for not requesting interpreters, but I'd appreciate it if you didn't show it on your face."

63. Dr. Ecock-Rotondo was once again, quite confused, as she hadn't made any "face" in response to the news of the interpreter delay.  Dr. Ecock-Rotondo was also now worried Ms. Newell had attempted to confront her in the small bathroom, where Ms. Newell would not have had to keep her voice low.

64. On another occasion during which Ms. Newell forgot to schedule an interpreter for a regularly scheduled staff meeting, Ms. Newell once again took her frustration at her own incompetence out on Dr. Ecock-Rotondo by blatantly mocking her.  Ms. Newell followed this mocking repetition of Dr. Ecock-Rotondo by threatening to remove Dr. Ecock-Rotondo's supervisory role over Ms. Beattie, stating "IF you continue supervising Greg…". Dr. Ecock-Rotondo interpreted this comment to be a threat to remove Dr. Ecock-Rotondo's supervisory role because Ms. Newell knew Dr. Ecock-Rotondo would not have forgotten Mr. Beattie's accommodations as Ms. Newell did.

65. Once again, in a similar manner to the encounter described in paragraph 58, Ms. Newell continued to stare at Dr. Ecock-Rotondo for an extended period; prompting Dr. Ecock--Rotondo to ask if their conversation was over.  Ms. Newell responded "yes, Jessica, as always" and Dr. Ecock-Rotondo then got up and turned to leave the room.  After turning, Ms. Newell asked when Dr. Ecock-Rotondo would be done with her dissertation. Although Dr. Ecock-Rotondo had just updated Ms. Newell on her degree progression two days prior, she once again told Ms. Newell, she would graduate this year.

66. Dr. Ecock-Rotondo interpreted this comment as a clear indication Ms. Newell wanted her to leave her position in the Center after obtaining her terminal degree because of her advocacy for Mr. Beattie.

67. The following month, on October 23, 2019, Dr. Ecock-Rotondo arrived at a meeting with Ms. Newell and several other staff members.  When Ms. Newell saw Dr. Ecock-Rotondo she stated, "this isn't good for Jessica, but it's national slap your roommate day."  Once again, Dr. Ecock-Rotondo was confused by her supervisor's aggressive behavior towards her and unsure how to respond replied "What?"

68. This encounter was noticed by Ms. Darci Lane Williams, Assistant Director in the Title IX Office, who emailed Dr. Ecock-Rotondo immediately afterward, stating she should "be an

actress" referring to Dr. Ecock-Rotondo's ability to navigate a threat of physical violence against her from her supervisor.

69. On multiple occasions, ranging from upon the start of Ms. Newell's tenure to the week she was departing, Dr. Ecock-Rotondo reported to Ms. Newell that Mr. Beattie was isolated in his office because Ms. Newell would not learn ASL to communicate with him.  Everything from casual conversations to important decision-making happened verbally in the office suite.  Dr. Ecock-Rotondo expressed concern to Ms. Newell that Mr. Beattie was not involved.  Ms. Newell would not seek Mr. Beattie's perspective or opinion, a noticeable difference to how she interacted with Mr. Graupman.

70. On one occasion, close in time to Dr. Ecock-Rotondo expressing her concerns about Mr. Beattie's isolation, on July 28, 2020, Ms. Newell told Dr. Ecock-Rotondo to hire a company or find an outside mentor to help her to find the next steps after her current role.  Dr. Ecock-Rotondo was taken aback by Ms. Newell's comments which seemed a clear threat in response to Dr. Ecock-Rotondo's advocacy.

71. Ms. Newell's verbal bullying behavior continued throughout the fall and winter of 2020-2021 including for example, on January 4, 2021, Ms. Newell writing in the office Slack channel "Jess - I believe it is you and I today lol that is a good start to the first Monday back".  Dr. Ecock-Rotondo recognized this as a sarcastic message (due to the lol) and was embarrassed it had been delivered to the entire office.

72. Other times, after the Center staff came back to working in-person on various days through the COVID-19 pandemic, Ms. Newell told Dr. Ecock-Rotondo she did not need to come into the office on her scheduled days or that Dr. Ecock-Rotondo should go home early and continue working from home.

73. Ms. Newell's differing treatment also included only scheduling Dr. Ecock-Rotondo for two days of in person work in the Center, while the rest of the staff was scheduled for three in person days.

74. It seemed clear to Dr. Ecock-Rotondo Ms. Newell did not want her in the office advocating for Mr. Beattie.

**Ms. Newell's Sex and Race-Based Decision Making**

75. In or around June 2019, in a discussion regarding Mr. Graupman's departure, Ms. Newell informed Dr. Ecock-Rotondo she would not hire Ms. Srikripa Kartik, a current RIT employee and former student employee in the Center, if she applied for the position Mr. Graupman was vacating.  Ms. Newell explained she wanted to fill Mr. Graupman's position with "a diverse hire" which apparently Ms. Newell did not think Ms. Kartik would be.

76. Ms. Kartik is, in fact, a woman of color and Dr. Ecock-Rotondo remarked as much to Ms. Newell.  Ms. Newell replied to clarify that by "diverse hire" she meant "black and white."  Apparently, Ms. Newell did not consider Ms. Kartik, a person of Southeast Asian heritage, "diverse".

77. Ms. Newell further stated she would prefer to hire a male for the role and specifically mentioned a Black male she worked with in the past, Mr. Jarron Mortimer.

78. On August 2, 2019, the search for Mr. Graupman's replacement began by posting the position on RIT's application management systems.  Ms. Kartik applied for the position.

79. A few days later, on August 6, 2019, Ms. Newell told Dr. Ecock-Rotondo the Center would need to wait to hire Mr. Graupman's replacement until January due to enrollment numbers. Knowing Ms. Kartik already applied, Dr. Ecock-Rotondo asked if Ms. Newell would be communicating with applicants who had already applied.  Ms. Newell did not answer.

80. Ten days later, on August 16, 2019, Mr. Beattie asked Ms. Newell if a search committee for the position was formed.  Ms. Newell replied confirming it hadn't and said she was meeting with Dr. Boulais on Monday to figure out a timeline.  Later, Ms. Newell would blame Dr. Ecock-Rotondo for the delay in the hiring process.

81. Ms. Newell's biases against women and for men also impacted her work with students.  In example:

    (a) During a Title IX Case Management Team meeting Ms. Newell found herself arguing against the majority of the group because Ms. Newell stated she would not consider a sanction of suspension in a case with serious allegations.  During this meeting, Ms. Newell asked Dr. Ecock-Rotondo to join, telling her afterwards she called Dr. Ecock-Rotondo because she was so angry at being challenged by the Title IX Team she needed to leave the meeting.  Ms. Newell stated the accused student could not have done what was alleged because he looked like he lived in his mom's basement; the woman who reported him must be "crazy"; and probably met him on Tindr.  These characterizations of parties to a Title IX sexual harassment and stalking case were shocking, particularly as they were made **by a person who was a decision maker in the process**.

(b)   In another case involving a male student accused of a Title IX allegation, Ms. Newell stated she would rather handle the allegations with an informal conversation than a hearing; stating multiple times he looked "so sweet", like "a mama's boy" and "like a surfer."

(c)   In a third example, involving a male student accused of Title IX violations multiple times, Ms. Newell told Dr. Ecock-Rotondo, she disapproved of Dr. Ecock-Rotondo's decision to suspend him after his second hearing. After returning from his suspension, Ms. Newell continued to offer this student her time and support despite having no reason to do so. This student was later involved in a third sexual harassment complaint and Ms. Newell was once again significantly involved in the case, including advocating for him during Title IX Case Management Team meetings.

(d)   Ms. Newell never advocated for women in a similar manner as she advocated for men in the process.

### Vendetta Against RIT's
### Title IX Coordinator

82. On June 24, 2019, Ms. Newell, Mr. Dave Graupman and Dr. Ecock-Rotondo were discussing a retreat with the Title IX Office the next day. Ms. Newell stated the three of them should record the Title IX Coordinator during the retreat. This was the second time Ms. Newell suggested recording the Title IX Coordinator, as she brought this up the week prior at a staff meeting.

83. Later that summer, on August 16, 2019, Ms. Newell told Dr. Ecock-Rotondo to tell the Title IX Coordinator all the things wrong in a Title IX report and said it should not come from her (Ms. Newell) but it should be "public" so that other people were aware of what the Title IX Coordinator was doing.

84. Ms. Newell reported mentioning issues the Title IX Office was having while Ms. Newell was at a tabling event with the Title IX Coordinator but stated she was not sure the Title IX Coordinator actually understood what Ms. Newell was saying.

85. Sometime in September 2019, Ms. Newell told Dr. Ecock-Rotondo the Title IX Coordinator wanted to observe the first Title IX hearing of the year, however Ms. Newell told her she could not because there were too many people observing. When Dr. Ecock-Rotondo asked who was observing the case Ms. Newell admitted no one was, she just didn't want the Title IX Coordinator in the room for the first hearing of the year. Ms. Newell clarified "I'm telling you this so you back me up" which Dr. Ecock-Rotondo interpreted as "I'm telling you this so you will lie for me if you are asked."

86. Upon information and belief, on or about, November 14, 2019, Ms. Newell told Ms. Brongo she recorded a conversation with a student and Ms. Lane Williams from the Title IX Office on her phone regarding a Title IX issue. Dr. Ecock-Rotondo was concerned this activity constituted a violation of RIT policy, including Privacy Policy C07.0. (*See* Exhibit 4.)

87. Pursuant to RIT's University Privacy Policy C07.0 defines

    (a)    "Personal Information" means any information concerning a person which, because of its nature, can be used to reasonably identify such person. Personal Information may be received, stored, and used in electronic form, on paper, or through any other medium. "Student" means Undergraduate Students, Graduate Students, non-matriculated Students and Students in not-for-credit programs.

88. This policy continues, stating "The university shall limit the collection, storage, use or disclosure of Personal Information to what is reasonably necessary for its academic, research and administrative functions" and

    (a)    RIT Community Members and RIT Guests who have access to Personal Information through employment at or affiliation with the university shall use the Personal Information solely for the purpose for which access was granted.

    (b)    When necessary and as required by the university in its sole discretion, the university shall implement mechanisms to ensure Personal Information is used and protected in accordance with this policy including, but not limited to, requiring nondisclosure and/or data protection agreements as a condition of access to Personal Information.

    (c)    Use of Personal Information for purposes other than that for which access was granted is prohibited and shall result in disciplinary action up to and including termination, or the commencement of student conduct proceedings.

89. Dr. Ecock-Rotondo understood RIT's Code of Ethical Conduct and Compliance obligated her to report violations of law or policy to her immediate supervisor, dean, divisional leader or appropriate university officer.  (*See*, Exhibit 3, RIT Code of Ethical Conduct and Compliance C00.00 § III (12), Obligation to Report Violations of Law or Policy.)

**Dr. Ecock-Rotondo's Report of Ms. Newell's
Inappropriate and Unethical Behaviors**

90. Dr. Ecock-Rotondo, having a good faith and reasonable belief Ms. Newell's behaviors constituted violations of law and RIT policies, and having already directly objected to Ms. Newell's discriminatory treatment of Mr. Beattie without effect, sought out a meeting with Dr. Boulais, Ms. Newell's supervisor.

91. On December 12, 2019, Dr. Ecock-Rotondo met with Dr. Boulais regarding Ms. Newell's behavior.  During this meeting Dr. Ecock-Rotondo reported Ms. Newell's

    (a)    cursing and yelling at Dr. Ecock-Rotondo,

    (b)    threatening to slap Dr. Ecock-Rotondo,

    (c)    secretly recording Title IX conversations and meetings,

    (d)    discriminating against and harassing Mr. Beattie, a Deaf employee

(e)   lack of concern regarding Mr. Beattie's isolation.

92. Dr. Boulais was unhelpful, responding Ms. Newell had done some bad things, however, she had a list of things [presumably from Ms. Newell] that Dr. Ecock-Rotondo had allegedly done and therefore there was "blame on both sides."[4]

93. Ultimately, Dr. Boulais told Dr. Ecock-Rotondo she should consider either (1) attending mediation with Ms. Newell or (2) resigning from RIT.

94. Of the two choices, option two appeared to be Dr. Boulais's preference as she repeatedly encouraged Dr. Ecock-Rotondo to discuss resigning with her family and shared a story of when Dr. Boulais resigned from a position due to conflict with a supervisor and it worked out for the best.  Dr. Boulais also shared Senior Vice President of Student Affairs, Ms. Sandra Johnson, was aware of Ms. Newell and Dr. Ecock-Rotondo's "conflict." Dr. Boulais told Dr. Ecock-Rotondo the situation was "a hot mess."

95. Dr. Boulais concluded the meeting by asking Dr. Ecock-Rotondo to set up a meeting for Mr. Beattie and Ms. Newell, to put it on Ms. Newell's calendar, and to arrange for an interpreter for the meeting.

96. RIT's Policy Prohibiting Discrimination, Harassment and Retaliation provides "Complaints may be made in person or in writing to [. . .] any RIT Supervisor."  (*See* Exhibit 1, Policy Prohibiting Discrimination, Harassment and Retaliation, C06.0, § III (I), Filing Complaints Under this Policy.)  The policy also promises individuals who report violations of this policy will be informed, in writing, of the outcome of RIT's investigation of the allegation.  (*See*, Exhibit 1, C06.0, § III (M).)  RIT's Code of Ethical Conduct also applies to this circumstance. (*See* Exhibit 2, C00.0 § 12.)

97. Dr. Ecock-Rotondo was never informed of the outcome of her complaints about Ms. Newell's behaviors.  Upon information and belief, Dr. Ecock--Rotondo's report of Ms. Newell's discriminatory and harassing conduct did not prompt any inquiry, let alone an investigation.

98. Ms. Newell's demeaning and disrespectful behavior towards Mr. Beattie did not change.

---

[4] The reason behind the lack of concern Dr. Boulais expressed regarding Ms. Newell's vendetta against the Title IX Office became clear to Dr. Ecock-Rotondo during a later conversation about the director role. (*See*, paragraphs 131-132, below.)

**Post Report Interactions**

99. On December 23, 2019, Dr. Boulais scheduled a meeting with Dr. Ecock-Rotondo and Ms. Newell, at Dr. Ecock-Rotondo's request.

100.   During this meeting held in or around early January 2020, Dr. Boulais framed the conversation as "team planning" and told Ms. Newell and Dr. Ecock-Rotondo they needed to become more civil, and they should utilize the services of a mediator to resolve "the conflict" between them.

101.   Ms. Newell was clearly uncomfortable with the idea of Dr. Boulais knowing there was tension between Ms. Newell and Dr. Ecock-Rotondo, stating early in the meeting, "I said to you [Dr. Ecock-Rotondo], what happens in conduct stays in conduct."

102.   In or around the first half of January 2020, Ms. Newell and Dr. Ecock-Rotondo did meet, but without the services of a mediator because Ms. Newell explained she did not want a witness in the room to the conversation.  Dr. Ecock-Rotondo felt as though she had to agree with Ms. Newell's suggestion for resolution, given Ms. Newell's supervisory position.

103.   The "conflict" was not resolved by this conversation.

104.   On March 13, 2020, the COVID-19 pandemic shut down RIT and the Center staff began to work from home.  Without regular in-person contact in the office, and with the addition of many more responsibilities related to COVID-19 on the campus, things became less tense between Dr. Ecock-Rotondo and Ms. Newell, however Ms. Newell's inappropriate treatment of Dr. Ecock-Rotondo continued.

105.   In April 2020 RIT requested department leaders submit forms outlining their team members' job responsibilities as the institution was determining which employees were "essential" and could be laid off.  On April 6, 2020, Ms. Newell submitted a form for Dr. Ecock-Rotondo describing her role as "completing administrative work" without mentioning hearings or conversations with students.  As this was a time when many staff in higher education were concerned for their job security, this was highly concerning to Dr. Ecock-Rotondo.

106.   Ms. Newell continued to make references to removing Mr. Beattie from Dr. Ecock-Rotondo's supervision whenever Dr. Ecock-Rotondo advocated for Mr. Beattie or when Dr. Ecock-Rotondo's support of Mr. Beattie was highlighted to Ms. Newell.

107.   In example, around April 21, 2020, Ms. Newell told Dr. Ecock-Rotondo, Mr. Beattie had "flourished" under Dr. Ecock-Rotondo's mentorship and supervision.  Ms. Newell then immediately followed this praise by indicating she would be providing Dr. Ecock-Rotondo with "updates regarding changes in the office slated to begin July 1, 2020" during an upcoming 1:1 meeting scheduled for April 23, 2020.

108.    Ms. Newell then canceled this April 23, 2020 1:1 meeting.

109.    In May 2020 Mr. Beattie provided an "upward appraisal" of Dr. Ecock-Rotondo as part of the performance review process.  Among other positive remarks Mr. Beattie stated

(a)    I really appreciate Jess's support throughout the year

(b)    Jess was also very supportive of my ideas for the Advocate Program and helped push me to get those projects done

(c)    I felt like Jess was always in my corner

(d)    Jess was also not afraid to push me outside of my comfort zone, as she encouraged me to apply for Staff Council even though I had a lot on my plate at the time. She encouraged me to consider my "long term plan" at RIT and to build a stronger network with people across RIT as that would open up future opportunities down the road

(e)    I also appreciated that Jess took the effort to attend ASL classes and we had a lot of fun conversations about the signs she learned in class, and I know that Jess always wanted to make sure I had access to any information in the office.

110.    Shortly thereafter, on June 24, 2020, Ms. Newell informed Dr. Ecock-Rotondo she would no longer supervise Mr. Beattie beginning July 1, 2020.

111.    Dr. Ecock-Rotondo was confused by this decision given the praise she received from Ms. Newell, and others, regarding her excellent supervision.  Ms. Newell did not provide any clear explanation for removing supervision from Dr. Ecock-Rotondo; first claiming Mr. Beattie deserved to be promoted so he could get supervisory experience, but he could not be promoted if Dr. Ecock-Rotondo, an associate director, was still supervising him.  (Later, Mr. Beattie was given responsibility for supervising three area directors but without ever being promoted.)  The next rationale supplied by Ms. Newell was that Dr. Boulais wanted Ms. Newell to remove Dr. Ecock-Rotondo's supervision and Ms. Newell was following her supervisor's orders.

112.    Upon information and belief, the true reason for the removal of Dr. Ecock-Rotondo's supervisory role was to retaliate against Dr. Ecock-Rotondo's due to her objecting to Ms. Newell's harassing and discriminatory behavior and reporting the same as more fully articulated in paragraphs 90-98 above.

113.    That Dr. Ecock-Rotondo was thriving in her role as supervisor is made clear by her 2019-2020 performance approval.  Dr. Ecock-Rotondo's skill in the category of Managing & Developing People was even particularly highlighted by Ms. Newell who stated, "Jessica excels in communicating important information and decisions in a timely manner, recognizes and develops talent, provides timely feedback, is thoughtful in making work challenging and meaningful and engaging for the conduct coordinator and residence life staff."  (*See* Exhibit 4, 2019-2020 Performance Evaluation.)

114.    In the email delivering the document Ms. Newell wrote, "Your PA has at least 5 or more uses of the word excellence or exceeds. It is all praise for your work over the year.... Words cannot fully capture your time, energy, abilities, skills of how amazing you are in your role as Associate Director." Dr. Ecock-Rotondo received a 5 out of 5 on her performance review; a rating so extraordinary it required approval from her division's Senior Vice President.

115.    Unfortunately, Ms. Newell's praise for Dr. Ecock-Rotondo was not reflected in her everyday treatment of Dr. Ecock-Rotondo through Fall 2020. In example, during a Zoom call on October 14, 2020, Ms. Newell told Dr. Ecock-Rotondo she "looked manic and crazy" when not wearing makeup, laughed out loud and then asked if Dr. Ecock-Rotondo was depressed.

116.    In May 2021 Dr. Ecock-Rotondo obtained her Ph.D. Her dissertation was "'Performing on a Tightrope': The Impact of Gender on College Conduct Administrators" a topic specific to the field of student conduct.

117.    Later that summer, Dr. Ecock-Rotondo began meeting with a licensed life coach to try to identify strategies to navigate her toxic workplace. Each session was focused on her work at RIT and specifically, her interactions with Ms. Newell. Dr. Ecock-Rotondo continued these coaching sessions until she learned Ms. Newell was leaving RIT.

**Ms. Newell's Departure**

118.    In the Fall 2021 semester Ms. Newell's strange behavior towards Dr. Ecock-Rotondo continued, including her telling Dr. Ecock-Rotondo a bizarre story about the Title IX Coordinator chasing her down a hallway after they got into an argument. Ms. Newell specifically mentioned the argument had gotten so loud Ms. Newell had to apologize to the Staff Assistant, Ms. Sally Quist, present outside the office space where the argument occurred. Upon information and belief, Ms. Quist later denied witnessing any "chase" scene between the Title IX Coordinator and Ms. Newell.

119.    Even more bizarrely, Ms. Newell brought up this "chase" to Dr. Ecock-Rotondo two more times and provided more detail each accounting. The last time Ms. Newell described being chased by the Title IX Coordinator all the way to an elevator, located down a hall and around two corners from where the meeting occurred; a significant distance and one in which multiple people would have noticed two people running down the hallway; one chasing the other. Dr. Ecock-Rotondo only replied "wow" given the wild account.

120.    In February 2022, Ms. Newell left RIT.

121.    Dr. Ecock-Rotondo, once again was given the interim director responsibilities for the Center and this time she was paid for the role.

122.   A search committee was formed to assist in the hiring process for the director role and a position description was posted. (*See*, Exhibit 5, Position Description.)

123.   RIT's Best Practice for Forming a Search Committee procedures explains "A good committee might include individuals who will be peers of the new hire, in his or her reporting chain, and among his or her 'client groups.'" (*See,* Exhibit 2, Forming a Search Committee paragraph 1.) None of the individuals on the 2022 search committee for the director role were individuals who would be peers of the director nor among the director's "client groups".

124.   Instead, this committee included an assistant director for the Center for Residence Life (who did not appear for Dr. Ecock-Rotondo's Zoom interview), Dr. Boulais, as well as a director of the English Language Center (a department that never worked with the Center) and a senior associate director in the Center for Campus Life (a role with very little interaction with the Center).

125.   Noticeably absent from the search committee membership was the Title IX Coordinator, a role which works with the Center on a daily basis. Also missing was a representative from Public Safety, an office which works with the Center on an even more frequent basis than the Title IX Coordinator.

126.   Dr. Ecock-Rotondo, once again applied for the director position. Unlike her first attempt, at the time of her 2022 application she had 13 years' experience in student conduct and her doctorate degree, a degree earned via her completion of a dissertation about student conduct.

127.   Additionally, while Dr. Ecock-Rotondo received a rating of 4/5 on her performance reviews every year employed by RIT, the year prior to her application (2020-2021) she received a 5, a rating so high it required approval from her division's Senior Vice President.

128.   Unfortunately, Dr. Boulais did not want Dr. Ecock-Rotondo to be in the role.

129.   Shortly after Ms. Newell announced her impending departure, Dr. Ecock-Rotondo and Dr. Boulais met to discuss Dr. Ecock-Rotondo's "vision" for the office. Dr. Ecock-Rotondo told her directly she wanted to be Director.

130.   Soon after this conversation Dr. Boulais emailed Dr. Ecock-Rotondo a job posting for a role at another university and said to "not read into it" but she thought Dr. Ecock-Rotondo would be a good fit for the role.

131.   When Dr. Boulais was ready to post the director position, she asked Dr. Ecock-Rotondo three different times to send it out to her colleagues to get "good candidates."

132.    Nevertheless, Dr. Ecock-Rotondo applied and was offered an interview with the search committee, and then an on-campus interview.

133.    Dr. Ecock-Rotondo was selected to participate in the on-campus interview process and was later told the search committee openly considered the race and gender of applicants when making the decision regarding who to invite.  Specifically, when discussing the final candidates to bring to campus, Dr. Boulais is reported to have exclaimed "No way we are going to invite two white women and not invite this black man."  Upon information and belief, the "two white women" refer to Dr. Ecock-Rotondo and another white female, woman interviewed for the position while the "black man" refers to Mr. Jarron Mortimer-the individual Ms. Newell had previously suggested for the Conduct Coordinator position vacated by Mr. Graupman.

134.    On June 6, 2022, three days before Dr. Ecock-Rotondo's on campus interview, Dr. Boulais scheduled Dr. Ecock-Rotondo's performance appraisal meeting for June 10, 2022, the day following her on-campus interview.  Dr. Ecock-Rotondo found this odd, knowing the third and final candidate interview for the director role had not yet occurred.

135.    On June 9, 2022, Dr. Ecock-Rotondo ended her on campus interview for the director position by meeting with Dr. Boulais.  During this meeting, Dr. Boulais explained her belief that the biggest issue for the new director will be dealing with campus partner relationships, particularly the relationship between the Center and the Title IX Office.

136.    Dr. Boulais further explained she wanted the new director to write down everything the Title IX Coordinator did wrong so they would be able to remove the Title IX Coordinator from her position.  Dr. Ecock-Rotondo was disturbed Dr. Boulais's primary goal for the new director was to sabotage the Title IX Coordinator.  As, at the time of this conversation, Dr. Ecock-Rotondo was a candidate for the director position, she was uncertain how to respond.

137.    The next day Dr. Boulais and Dr. Ecock-Rotondo met for Dr. Ecock-Rotondo's performance review.  Dr. Boulais assessed Dr. Ecock-Rotondo's 2021-2022 performance as a "4 out of 5" indicating Dr. Ecock-Rotondo's performance during appraisal period met all expectations and frequently exceeded some expectations.

138.    Some of Dr. Boulais's comments about Dr. Ecock-Rotondo's performance noted in this 2021-2022 evaluation included:

(a)    Your support for team connections, professional development and career growth for the entire team including the administrative staff and students was especially strong in this past year.

(b)    Despite many hurdles and transitions, you worked hard to create positive connections and ongoing training for the team, the Res Life staff and TIX partners. You made these connections valued and fun – building from previous foundations and maintaining a positive momentum in your office.

(c)     Your knowledge of policy, practice and particularly the Maxient system served you well throughout this time and allowed you to provide leadership in this area of training. Your developmental and collaborative approach and support of [Mr. Beattie's] leadership in this area have allowed for stronger partnership and laid the foundation for a stronger year ahead.

(d)     I would also note that you readily and positively engage with division and University meetings, events, trainings etc. and are well-informed about the campus culture and activities.

(e)     Nearly every aspect of your role requires partnerships (TIX, Res Life, Public Safety, Wellness, SBCT, etc.) and you work diligently to establish and maintain these connections. You share training and professional development opportunities, and you work seamlessly engage colleagues in the conduct process (hearing officers, advocates, etc.) with special focus on Residence Life staff.

(f)     RIT has a strong commitment to advancing a culture and climate that is fully supportive of the goals of respecting diversity and striving for inclusion in all aspects of our work. In the past year you were called upon in your assessment coordinator role to partner with Jennifer Maltby to complete the project designed to look at conduct outcomes with respect to identity-based characteristics to look for inconsistencies. You did an excellent job on this work and delivered a meaningful and comprehensive report to senior leadership that will serve as a foundation of future planning to ensure equity and fairness in the conduct process for all students – regardless of their identity profile.

139.    After reviewing her performance appraisal, Dr. Boulais said she wanted to talk about a topic somewhere between the director search and Dr. Ecock-Rotondo's performance review; she referred to this portion of the conversation as a "squishy middle."

140.    Dr. Boulais asked what Dr. Ecock-Rotondo would do if she did not get the director role; explaining there was a "really competitive pool."

141.    Dr. Ecock-Rotondo responded she would see who the new director was but would most likely leave.

142.    Dr. Boulais immediately replied, "I think that's a good idea" before explaining Dr. Ecock-Rotondo had "topped out" in her current role and done all she could and stated she did not want Dr. Ecock-Rotondo to make it awkward for the new director citing her belief that Dr. Ecock-Rotondo did not have a good relationship with Ms. Newell.

143.    Dr. Boulais neglected to consider the reason for Dr. Ecock-Rotondo's relationship with Ms. Newell being "not good" was because Dr. Ecock-Rotondo was uncomfortable with Ms. Newell's harassing, discriminatory and unethical behaviors, behaviors Dr. Ecock-Rotondo had reported to Dr Boulais.

144.   Dr. Boulais ended the meeting by offering to help Dr. Ecock-Rotondo with a lateral transfer to Residential Life.

145.   On June 17, 2022, Dr. Boulais emailed Dr. Ecock-Rotondo informing her she was completing reference checks and would have an update on the status of the position the following week.

146.   After another week passed, Dr. Ecock-Rotondo again emailed Dr. Boulais.

147.   On June 27, 2022, Dr. Boulais responded, indicating it was difficult to reach Dr. Ecock-Rotondo's references, specifically mentioning Mr. Gary Moxley, Director, Public Safety who Dr. Boulais explained was on vacation.  She stated she hoped to have an answer by the following day.

148.    Dr. Ecock-Rotondo later learned Dr. Boulais did not contact Dr. Ecock-Rotondo's references until June 27, 2022, and while Mr. Moxley immediately replied to Dr. Boulais's outreach stating he would be happy to speak with Dr. Boulais, despite his being on vacation, Dr. Boulais did not reply to his offer.

149.   The next morning, June 28, 2022, Dr. Boulais informed Dr. Ecock-Rotondo she would not be hired for the director role, explaining the successful candidate had "extensive" conduct, residence life, and Title IX experience and came from an HBCU- a historically black college or university.

150.   While the successful candidate, Mr. Jarron Mortimer (the same person Ms. Newell suggested becoming the "Conduct Coordinator" in paragraph 78 above) does have some higher education experience, he is far less qualified for the director role when compared to Dr. Ecock-Rotondo.  (*See,* Exhibit 6, Dr. Ecock-Rotondo Resume and Exhibit 7, Mr. Mortimer's LinkedIn Experience Profile.)

(a)   Dr. Ecock-Rotondo has 14 years of full-time experience in higher education.

    (i)   A review of Mr. Mortimer's LinkedIn profile indicates he has six years of full-time experience in higher education.

(b)   Dr. Ecock-Rotondo has 12.5 years of experience working full-time in offices of student conduct at large colleges and universities.

    (i)   A review of Mr. Mortimer's LinkedIn profile reveals he has zero years of full-time experience working in offices of student conduct at large colleges and universities.

(c)   Dr. Ecock-Rotondo has a PhD in education and her thesis is specifically focused on the topic of student conduct.

    (i)   A review of Mr. Mortimer's LinkedIn profile reveals Mr. Mortimer does not have a terminal degree.

(d)   Dr. Ecock-Rotondo is conversational in ASL.

(i)   Upon information and belief, Mr. Mortimer did not know ASL or about Deaf culture at the time of his application.

151.   After Dr. Ecock-Rotondo was informed that she was not the successful candidate for the position, one of the search committee members approached her to express their dismay at the process and sharing Dr. Boulais's personal animosity towards Dr. Ecock-Rotondo was blatantly apparent to members of the search committee.

152.   The search committee member explained the decision not to hire Dr. Ecock-Rotondo was "personal" and not based on Dr. Ecock-Rotondo's qualifications for the position; Dr. Ecock-Rotondo was clearly the most qualified candidate for the position.

153.   When it became clear Dr. Boulais did want to hire Dr. Ecock-Rotondo, the committee member asked Dr. Boulais to explain.  Dr. Boulais then shared her opinion that Dr. Ecock-Rotondo had nothing else to improve on and did not "want to grow", apparently ignoring that Dr. Ecock-Rotondo was currently applying for a promotion.

154.   Noting Dr. Boulais's apparent affection for Mr. Mortimer (the Black man who was ultimately hired as director) the committee member suggested Mr. Mortimer be hired into the associate director position, given his lack of qualifications for the director role.  Dr. Boulais in a sneering response replied that the idea of asking Mr. Mortimer who held a "director" title at his (very small) current employer to move to a "lower" title of "associate director" was ridiculous.

155.   Interestingly, just a few short months after Dr. Boulais scoffed about the inappropriateness of asking Mr. Mortimer to accept a lower title than one held at the time of his application, RIT hired a white, female candidate with a much higher "Dean of Students" title at the time of her application into an open associate director position in the Center.

156.   Upon information and belief, the successful candidate, a Black man, who is less qualified than Dr. Ecock-Rotondo was hired because

(a)   Dr. Boulais preferred to hire a Black man over a white woman.  (Importantly, at the time of this search, the only two people of color (Black men) in Dr. Boulais supervisory line had recently left their director roles.) and/or

(b)   Dr. Boulais was angry Dr. Ecock-Rotondo reported Ms. Newell's discriminatory and harassing behaviors and refused to promote her into the director role in retaliation for those reports.

**AS FOR A FIRST CAUSE**
**Retaliatory Harassment and Discrimination**
**In Violation of the ADA and NYSHRL**

157.   Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

158.   The ADA and NYSHRL prohibit harassment and discrimination on the basis of disability and prohibit retaliatory harassment against an employee who complain of, or object to, disability discrimination and harassment.

159.   Plaintiff was engaged in protected activity when she opposed Ms. Newell's disability harassment and discrimination of Mr. Beattie.  Examples of plaintiff opposing Ms. Newell's disability related harassment and discrimination include plaintiff

   (a)   Suggesting Ms. Newell learn ASL and meet with Mr. Beattie as more fully described in paragraph 33 and 34, above.

   (b)   Objecting to Ms. Newell's infantilizing Mr. Beattie and making assumptions about his ability to be in the workspace alone as more fully described in paragraph 35 and paragraph 36 (a)-(c), above.

   (c)   Objecting to RIT's inability to install an operational strobe light for the office as a necessary accommodation for Mr. Beattie as described in paragraphs 36 (d) and 37, above.

   (d)   Objecting to Ms. Newell's suggestions Mr. Beattie was incapable of overseeing the Advocate Program and Code Review Committee as more fully described in paragraphs 38 and 40, above.

   (e)   Objecting to Ms. Newell's characterization of Mr. Beattie as less qualified than Mr. Graupman as more fully described in paragraphs 56-59, above.

   (f)   Reminding Ms. Newell her unwillingness to learn ASL contributed to Mr. Beattie's isolation in the office as more fully described in paragraph 70, above.

   (g)   Complaining about of Ms. Newell's discrimination and harassment of Mr. Beattie to Dr. Boulais, an RIT supervisor and associate vice president, as more fully described in paragraphs 90-98, above.

160.   Additionally, Ms. Newell perceived Dr. Ecock-Rotondo to be engaged in protected activity of advocating for Mr. Beattie's receipt of disability-related work-place accommodations in as more fully described in paragraphs 51-54 and 60-64, above.

161.   Defendant is aware plaintiff engaged in this protected activity because two of its supervisory staff, Ms. Newell and Dr. Boulais, were recipients of plaintiff's objections and complaints.

162.    Shortly after plaintiff's objecting to Ms. Newell's disability-based harassment and discrimination of Mr. Beattie, and/or shortly after Ms. Newell perceived plaintiff to have engaged in protected activity, Ms. Newell and Dr. Boulais engaged in retaliatory harassment towards plaintiff.

(a)    Examples include Ms. Newell's

(i)    Engaging in verbal harassment such as,

(A)    Calling Dr. Ecock-Rotondo "roommate" rather than using her name as more fully described in paragraphs 43 and 67, above.

(B)    Yelling "fuck you!" at Dr. Ecock-Rotondo in the Center office and in front of a student as more fully described in paragraph 44, above.

(C)    Threatening to remove Dr. Ecock-Rotondo's supervisory role whenever she advocated for Mr. Beattie as more fully described in paragraphs 48 and, 64, above.

(D)    Mocking Dr. Ecock-Rotondo as more fully described in paragraphs 65 and 71, above.

(E)    Suggesting Dr. Ecock-Rotondo leave her position when Dr. Ecock-Rotondo brought up concerns regarding Mr. Beattie's treatment in the office as more fully described in paragraphs 65-66, and 70.

(F)    Suggesting Dr. Ecock-Rotondo looked "manic and crazy" and asking if she was depressed as more fully described in paragraph 116, above.

(ii)    Engaging in physically threating and/or intimidating behaviors such as,

(A)    Attempting to throw items at Dr. Ecock-Rotondo as more fully described in paragraph 44, above.

(B)    Putting her arm around Dr. Ecock-Rotondo's neck and squeezing as more fully described in paragraph 47, above.

(C)    Following Dr. Ecock-Rotondo into the bathroom and waiting for her there as described more fully in paragraph 61, above.

(D)    Raising her voice, balling her fists, and staring at Dr. Ecock-Rotondo for an uncomfortably long period of time as more fully described in paragraphs 59, 62-64, 66, above.

(E)    Declaring it "national slap your roommate day" as more fully described in paragraph 67, above.

(b)    In example, Dr. Boulais

(i)    Engaging in verbal harassment such as,

(A)    Blaming Dr. Ecock-Rotondo for Ms. Newell's harassing behaviors immediately after she reported Ms. Newell's harassment as more fully described in paragraphs 92-95, above.

(B) Encouraging Dr. Ecock-Rotondo to resign immediately after she reported Ms. Newell's harassment as more fully described in paragraphs 92-95, above.

(C) Characterizing Ms. Newell's harassment of Mr. Beattie as a "conflict" between Dr. Ecock-Rotondo and Ms. Newell, as more fully described in paragraphs 94 and 101, above.

(D) Encouraging Dr. Ecock-Rotondo to resign if she were not selected for the director position as more fully described in paragraphs 141 and 142, above.

163. After plaintiff objected to Ms. Newell's disability-based harassment and discrimination of Mr. Beattie, and/or after Ms. Newell perceived plaintiff to have engaged in protected activity described in paragraph 161, above, Ms. Newell and Dr. Boulais engaged in retaliatory discrimination by, for example,

(a) Subjecting Dr. Ecock-Rotondo to different workplace conditions as more fully described in paragraphs 72-73, above.

(b) Removing Dr. Ecock-Rotondo's supervisory role as more fully described in paragraphs 107-113, above.

(c) Refusing to hire Dr. Ecock-Rotondo for the position of director of the Center in 2022, despite her being the most qualified applicant for the position as more fully described in paragraphs 151-157, above.

164. Defendant's conduct would discourage a reasonable person from making a complaint of discrimination.

165. As a direct, proximate, and foreseeable consequence of the above-referenced conduct, plaintiff's career prospects, earning potential, and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages. Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendant's conduct and also seeks punitive damages, attorney's fees, and costs.

## IN THE ALTERNATIVE
## AS FOR A SECOND CAUSE

### Sex and Race Based Discrimination
### In Violation of NYSHRL

166.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

167.    Plaintiff is a white, female woman and is known by defendants to be a white, female woman.

168.    Plaintiff was qualified for and applied to the position of director of the Center in 2022.

169.    Defendant, through its supervisor Ms. Newell, expressed a preference for hiring Black men over women for positions in the Center as more fully described in paragraphs 75-77, above.

170.    Defendant used race and gender as a decision-making factor in its hiring process during the 2022 Center director search, as more fully described in paragraph 134, above.

171.    Defendant declined to hire plaintiff for the director position hiring a less qualified Black man for the director position as more fully described in paras 151-157, above.

172.    Defendant indicated its rationale for hiring Mr. Mortimer being connected to his race when Dr. Boulais told plaintiff Mr. Mortimer was hired because "he was from an HBCU" as more fully described in paragraph 149, above.

173.    Defendant hired the less qualified Black man because of his race, sex and gender and not because of his qualifications for the role.

174.    As a direct, proximate, and foreseeable consequence of the above-referenced conduct, plaintiff's career prospects, earning potential, and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.  Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendants conduct and punitive damages, seeks attorney's fees, and costs.

**IN THE ALTERNATIVE**
**AS FOR A THIRD CAUSE**

**Sex Based Discrimination**
**In Violation of Title IX**

175.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

176.    Defendant is an educational institution which receives federal funds and is subject to Title IX's prohibition on sex-based discrimination.

177.    Plaintiff is female and a woman and is known by defendants to be female and a woman.

178.    Plaintiff was qualified for and applied to the position of director of the Center in 2022.

179.    Defendant, through its then employee Ms. Newell, expressed a preference for hiring males and men over females and women as more fully described in paragraphs 75-77, above.

180.    Ms. Newell's preference for males and men over females and women in general, as more fully described in paragraphs 76-77, 81, above, influenced the Center's hiring decisions.

181.    Ms. Newell's influence over the 2022 Center director search is apparent given the candidate she suggested for the 2019 conduct coordinator position, whom she worked with at another institution in the past, was the successful candidate in the director search, despite his clear lack of qualifications for the role.

182.    Defendant, through its employee Dr. Boulais, openly used sex and gender as a decision-making factor in its hiring process during the 2022 Center director search, as more fully described in paragraph 134, above.

183.    Defendant declined to hire plaintiff for the director position hiring a less qualified man for the director position as more fully described in paragraphs 151-157, above.

184.    Defendant did not hire plaintiff because she is a female woman and not a man.

185.    As a direct, proximate, and foreseeable consequence of the above-referenced conduct, plaintiff's career prospects, earning potential, and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages. Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendants conduct and punitive damages, seeks attorney's fees, and costs.

## AS FOR A FORTH CAUSE
### Breach of Contract

186.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

187.    An implied employment contract exists between plaintiff and defendant.

188.    Defendant's policies and procedures, including, but not limited to, those policies and procedures included at Exhibits 1-4, created the terms and conditions of plaintiff's contract with defendant.

189.    Plaintiff fulfilled all her obligations under the contract.

190.    Defendant did not fulfill its obligations under the contract.

191.    Specifically, defendant failed to fulfill its obligations under its contract with plaintiff when it did not respond to Dr. Ecock-Rotondo's reports of harassment and discrimination including;

    (a)    When Ms. Newell did not respond to Dr. Ecock-Rotondo's reports of harassment and discrimination in the manner required by RIT's Harassment and Discrimination Policy as more fully articulated in paragraph 159, above.

    (b)    When Dr. Boulais did not respond to Dr. Ecock-Rotondo's reports of harassment and discrimination in the manner required by RIT's Harassment and Discrimination Policy as more fully articulated in paragraph 162 (b), above.

    (c)    When Ms. Newell and Dr. Boulais engaged in retaliatory harassment in violation of RIT's Harassment and Discrimination Policy as more fully articulated in paragraphs 162, and 163, above.

192.    Defendant also violated the terms of its contract with plaintiff when it failed to follow its hiring policies and procedures by, for example

    (a)    Failing to create a search committee in a manner consistent with its policies as more fully described in paragraphs 122-125, above.

    (b)    Considering the race, sex and gender of applicants when making hiring decisions as more fully described in paragraph 133, above.

    (c)    Making hiring decisions on the basis of race, sex and gender as more fully described above in paragraphs 149, 154-156, above.

193.    Defendant also violated the terms of its contract with plaintiff when it failed to follow its Code of Ethical Conduct and Compliance Policy by declining to promote Dr. Ecock-Rotondo

after she complained of Ms. Newell's disability harassment and discrimination and violations of RIT's Privacy Policy (as more fully described in paragraphs 91-95, and 97, above).  (*See*, Exhibit 2, C00.0 § 13.)

194.    As a direct, proximate, and foreseeable consequence of the above-referenced conduct, plaintiff has been severely harmed.  She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.  Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendant's conduct and also seeks punitive damages and costs.

**WHEREFORE**, by reason of the foregoing, plaintiff Dr. Jessica L. Ecock-Rotondo hereby respectfully requests the following relief:

    (A) Damages at an amount to be proven at trial;

    (B) Attorney's Fees and Costs of suit;

    (D) Such other and further relief as the court deems just and proper.


Dated: Fairport, NY

       March 20, 2023

                                J. Morgan Levy Firm, PLLC


                         By:      */s/ J. Morgan Levy*
                                  J. Morgan Levy, Esq.
                                  24 N. Main Street, Ste. 2
                                  Fairport, NY 14450
                       Tel.     585.678.1160
                       Email:   morgan@jmorganlevyfirm.com


TO:    Rochester Institute of Technology
        ATTN: Bobby Colon,
        One Lomb Memorial Drive
        Rochester, New York