UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DR. JESSICA L. ECOCK-ROTONDO, PH.D.,

Plaintiff,

v.

ROCHESTER INSTITUTE OF TECHNOLOGY,

Defendant.

---

**DECISION AND ORDER**

6:23-CV-6166 EAW

## INTRODUCTION

Plaintiff Dr. Jessica Ecock-Rotondo, Ph.D. ("Plaintiff") brings this action against her former employer, defendant Rochester Institute of Technology ("Defendant" or "RIT"), alleging gender and race discrimination in violation of Titles VII and IX of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, ("Title VII" and "Title IX"), and the New York State Human Rights Law, New York Executive Law § 290, *et seq.* ("NYSHRL"); disability retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and the NYSHRL; and breach of contract. (Dkt. 9).

Pending before the Court are the parties' cross-motions for summary judgment. (Dkt. 45; Dkt. 46). For the following reasons Plaintiff's motion for summary judgment is denied, and Defendant's motion for summary judgment is granted in part and denied in part.

## PROCEDURAL HISTORY

Plaintiff filed her original complaint on March 21, 2023. (Dkt. 1). Defendant moved to dismiss on June 22, 2023. (Dkt. 6). Before the Court decided Defendant's motion to dismiss, Plaintiff filed an amended complaint. (Dkt. 9). The Court denied the motion to dismiss as moot (Dkt. 10) and Defendant filed an answer on August 24, 2023 (Dkt. 15).

On November 7, 2025, Defendant filed a motion for summary judgment on all of Plaintiff's claims (Dkt. 45), and Plaintiff filed a cross-motion for summary judgment on her claim for race discrimination under Title VII and the NYSHRL[1] (Dkt. 46). On December 8, 2025, Plaintiff opposed Defendant's motion for summary judgment. (Dkt. 58). On December 22, 2025, Defendant responded to Plaintiff's motion for summary judgment (Dkt. 62), and replied to Plaintiff's opposition (Dkt. 64). Plaintiff filed two motions to seal exhibits related to the summary judgment motions (Dkt. 49; Dkt. 60), which were denied by the Court on August 9, 2026 (Dkt. 70).

[1] Defendant argues that Plaintiff's motion for summary judgment must be denied because the motion was not filed by the dispositive motion deadline. (Dkt. 62 at 8-9; Dkt. 43). The Scheduling Order required that all dispositive motions be filed by November 7, 2025. (Dkt. 43). Plaintiff filed her motion at 12:00 a.m. on Saturday, November 8, 2025. (Dkt. 46). The exhibits (Dkt. 47) were filed at 1:29 a.m. and the statement of material facts was submitted at 1:34 a.m. that same day (Dkt. 48). While not condoning the untimeliness, the Court would likely allow an extension under the circumstances. But the Court need not decide this issue because, for the reasons explained below, Plaintiff's motion for summary judgment is denied on the merits.

## FACTUAL BACKGROUND

The following facts are taken from Defendant's and Plaintiff's Rule 56 statements (Dkt. 45-2; Dkt. 48), as well as the exhibits submitted by the parties. Unless otherwise noted, these facts are undisputed.

### I. RIT

RIT is a private research university containing nine colleges and two degree-granting units. (Dkt. 45-2 at ¶ 1). RIT's enrollment consists of approximately 19,000 students across its undergraduate, masters, and Ph.D. programs. (Dkt. 47-26).

In recent years, RIT has sought to create a more inclusive and diverse environment. (Dkt. 47-22; Dkt. 47-26; Dkt. 47-30). RIT collaborated with students, faculty, and staff to create new diversity, equity, and inclusion initiatives. (Dkt. 47-22). For example, RIT's strategic plan for 2018-2025, titled "Greatness Through Difference," discussed the school's commitment to enrolling a diverse group of students and hiring diverse faculty. (Dkt. 47-26; Dkt 47-50). RIT hired an Assistant Director of Talent Acquisition & Staff Diversity Outreach to assist in this mission. (Dkt. 47-13). RIT also provided its Human Resources employees with training on inclusive hiring practices. (Dkt. 47-38; Dkt. 47-39).

The Student Affairs department at RIT shared this commitment to diversity. (Dkt. 47-25; Dkt. 47-30; Dkt, 47-34; Dkt. 47-35). In 2019, Student Affairs created its own strategic plan which articulated two main goals: (1) to "[r]ecruit and retain a racially and ethnically diverse community of staff," and (2) to "[c]reate and maintain a culture of inclusion and equity." (Dkt. 47-25). In the 2020 Strategic Plan Annual Report, the department expressed its goal to "[o]perationalize [its] commitment to diversity, equity,

and inclusion" in the coming year. (Dkt. 47-35). Specifically, the department sought to increase the number of African American, Latino American, and Native American staff. (*Id.*). In October 2021, RIT's Senior Vice President of Student Affairs shared that the department continued to prioritize diversity. (Dkt. 48 at ¶ 29; Dkt. 47-36).

## II. Plaintiff's Employment at RIT

In January 2013, RIT hired Plaintiff, a Caucasian female, as its Associate Director for the Center of Student Conduct and Conflict Resolution. (Dkt. 45-2 at ¶ 8; Dkt. 59-49 at ¶ 10; Dkt. 48 at ¶¶ 1-2). The Center of Student Conduct and Conflict Resolution is part of RIT's Student Affairs department. (Dkt. 47-20). Plaintiff was hired as an at-will employee with no set term of employment. (Dkt. 45-2 at ¶ 9; Dkt. 59-49 at ¶ 9). As Associate Director, Plaintiff reported to the Director of the Center of Student Conduct. (Dkt. 45-2 at ¶ 10). From 2013 to 2018 the Director was Joe Johnston. (*Id.*).

In 2018, Johnston accepted a new position at RIT and was no longer Director. (Dkt. 45-2 at ¶ 12). Plaintiff applied for the Director role in 2018 but was not selected. (*Id.* at ¶ 13). Jennifer Newell, a Caucasian female, was hired for the role. (*Id.* at ¶ 14). Plaintiff began reporting to Newell in September 2018. (*Id.* at ¶ 16). Throughout Newell's tenure as Director, Plaintiff and Newell experienced a series of challenges to their working relationship, many of which were reported to Dr. Nicole Boulais, the Associate Vice President of Student Affairs. (*Id.* at ¶ 17). Plaintiff says she experienced animosity and anger from Newell. (*Id.* at ¶ 18). For example, Plaintiff claims that Newell "stated that she wanted to slap Plaintiff for national roommate day," "pretended to throw [a] tissue box at Plaintiff and yelled, 'fuck you,'" "put her arm around Plaintiff's neck and squeezed," and

blocked Plaintiff from leaving the office on several occasions. (Dkt. 59-49 at ¶ 8; Dkt. 45-2 at ¶¶ 18-19, 44-55). Plaintiff believes that these actions occurred in part because she is a woman. (Dkt. 45-2 at ¶¶ 20-21).

But Plaintiff also believes these actions were a result of her advocacy on behalf of a disabled co-worker. (*Id.* at ¶ 22). In 2018, Plaintiff began supervising Center of Student Conduct employees David Graupman and Greg Beattie. (*Id.* at ¶ 11). Beattie is deaf. (*Id.* at ¶ 22). Plaintiff worked with Beattie to make the office more accommodating. She requested a strobe light fire alarm and bigger office for Beattie, and suggested Newell learn American Sign Language. (*Id.* at ¶¶ 24, 36-40). Plaintiff also expressly disagreed with what she characterized as Newell's infantilizing behavior towards Beattie and belief that Beattie was unable to be alone and incapable of overseeing certain department programs. (*Id.* at ¶¶ 38, 40, 41). Plaintiff contends that Newell's aggression towards her was often in reaction to her advocacy for Beattie. (*Id.* at ¶¶ 22, 26). She says Newell would tease and demean her, follow her to the bathroom, yell at her, make fists, comment on her appearance, and react angrily to Plaintiff's advocacy. (*Id.* at ¶¶ 44-55). On one occasion Plaintiff says Newell attempted to throw things at her. (*Id.* at ¶ 50). On another, Newell told Plaintiff she looked "manic and crazy." (*Id.* at ¶ 49). After Plaintiff raised concerns about Newell's treatment of Beattie, Plaintiff alleges that Newell suggested Plaintiff resign. (*Id.* at ¶ 48).

In December 2019, Plaintiff discussed these issues with Dr. Boulais. (*Id.* at ¶ 28). Plaintiff viewed the meeting as an opportunity to "formally report . . . Newell's unethical and discriminatory conduct." (Dkt. 59-49 at ¶ 28). At this meeting, Plaintiff expressed her concerns with Newell's inability to communicate with Beattie. (Dkt. 45-2 at ¶ 29). Plaintiff

claims that Dr. Boulais blamed her for the conflicts with Newell and encouraged her to resign. (*Id.* at ¶¶ 56-57). In January 2020, Dr. Boulais met with Plaintiff and Newell to suggest that they find a way to address the ongoing conflict between them. (*Id.* at ¶ 30). Shortly after, Plaintiff and Newell met to discuss their problems. (*Id.* at ¶ 31). The parties disagree as to the success of the meeting. Defendant says there was an "open, productive conversation where they both discussed the challenges that they had with the working relationship" (*id.*), but Plaintiff says, "Newell not only failed to acknowledge her discriminatory behaviors, but . . . threatened plaintiff [that] they needed to settle this issue or she was going to report plaintiff for insubordination to HR" (Dkt. 59-49 at ¶ 31). Plaintiff acknowledged that she felt better after this conversation with Newell. (Dkt. 45-2 at ¶ 31; Dkt. 45-8 at 201-202). Later in 2020, Newell gave Plaintiff a performance review which said she "[e]xceeds [e]xpectations," and in 2021 gave a performance review that called her "[o]utstanding." (Dkt. 45-2 at ¶¶ 32-33; Dkt. 48 at ¶¶ 99-100).

At some point between 2020 and 2021, Beattie was removed from Plaintiff's supervision and placed under Newell's supervision. (Dkt. 45-2 at ¶ 34). The parties disagree as to the exact dates of the change, and the reasoning behind it. Defendant says the change occurred in 2021 as a result of an internal restructuring based on the determination that "a flat organizational structure . . . would be more efficient and effective for the department." (Dkt. 45-2 at ¶ 34). On the other hand, Plaintiff says the restructuring occurred in July 2020, in retaliation for her advocacy for Beattie. (Dkt. 59-49 at ¶¶ 34, 46). Plaintiff says that the retaliation continued when Newell posted a chart of the new department structure, which showed that Plaintiff was the only one without other

employees reporting to her. (*Id.*). The change did not impact Plaintiff's salary. (Dkt. 45-2 at ¶ 34). In January 2022, Newell left RIT to join a different institution. (*Id.* at ¶ 35).

### III. The 2022 Director Search

Following Newell's resignation, RIT began its search for a new Director for the Center of Student Conduct and Conflict Resolution. (Dkt. 45-2 at ¶ 62; Dkt. 48 at ¶ 42). Dr. Boulais was named hiring manager for the search. (Dkt. 48 at ¶ 43; Dkt. 45-2 at ¶ 65). Dr. Boulais assembled a search committee which included herself; Marykatherine Woodson, a Black female that served as Associate Director of Residence Life; Sara Bayerl, a Caucasian female who was the Senior Associate Director of Campus Life; and Stanley Van Horn, a Caucasian male who served as Director of the English as a Second Language Department. (Dkt. 45-2 at ¶¶ 65-66; Dkt. 48 at ¶ 44).

In February 2022, Plaintiff told Graupman that she would quit if she was not hired for the Director position. (Dkt. 45-2 at ¶ 63). Then in April 2022, Plaintiff told Graupman that she was "debating even applying" for the position, but did not "want to make it easy for them." (*Id.* at ¶ 67). She texted another friend saying "I decided I'm leaving RIT. Don't know how soon but I'm done. I'm looking for jobs and meeting with recruiters." (*Id.* at ¶ 68). She added that RIT "clearly do[es not] value" her. (*Id.*). In another text to Graupman in May 2022, Plaintiff stated that "it'll be amazing to get the fuck out of" RIT. (Dkt. 45-23). And in texts to another friend, she says that her "only concern is sounding genuine enough about wanting to work [at RIT]." (Dkt. 45-2 at ¶ 70). Ultimately Plaintiff decided to apply for the Director position. (*Id.* at ¶ 71). She told Graupman: "I applied for the director job. Nicole [Boulais] needs to say no to me, I'm not letting her off easy." (*Id.*).

The job posting for the Director position indicated that a candidate must have the following minimum qualifications: a master's degree in higher education or a related field; at least six-years of experience in managing student conduct or related work; experience in planning, leading, and evaluating programs; the ability to manage confidential information; budget experience; experience using a data-driven approach; the ability to maintain effective working relationships with a diverse group; knowledge of deaf culture and American Sign Language, or a willingness to learn; leadership, organizational, and project management skills; the understanding of a diverse student body; computer competence; and organizational and time management skills. (Dkt. 45-18).

To begin the Director search, Jahmar Elliott, a Black male who served as the Assistant Director for Talent Acquisition & Staff Diversity Outreach, conducted the initial screening of candidates. (Dkt. 45-2 at ¶ 72; Dkt 48 at ¶ 45). In his role, Elliott worked to "[h]ire, promote, and retain diverse, outstanding staff in numbers commensurate with faculty and student bodies." (Dkt. 47-15; Dkt. 48 at ¶ 32). The Director search was Elliott's first search with the Student Conduct office. (Dkt. 48 at ¶ 62). The parties dispute the format of the initial screening procedure. Defendant says that Elliott conducted screening calls with candidates. (Dkt. 45-2 at ¶¶ 72-73). Plaintiff says that Elliott "requested candidates send him a recording of themselves answering" interview questions. (Dkt. 59-49 at ¶¶ 71-72). Regardless, during the screening process Elliott recorded information about the candidates in a document called an "applicant tracker." (Dkt. 48 at ¶ 47). The applicant tracker included basic information about the candidates, including their contact

information, current employment, salary expectations, and "diversity metrics" such as gender and race. (Dkt. 48 at ¶ 49; Dkt. 45-27).

Following screening, Elliott's notes said that Plaintiff had "a solid level of leadership experience in and around RIT. Demonstrated good institutional knowledge and [would be the] easiest to transfer into [the] role." (Dkt. 45-2 at ¶ 74; Dkt. 45-27; Dkt. 48 at ¶ 54). Elliott also indicated that Plaintiff was the "most experienced of the 5 candidates." (Dkt. 45-27). His notes added that she was "not HR's top candidate," but that he "would still consider her for the role." (*Id.*). Elliott's notes on Mortimer said that he was one of the top two candidates, and meets the department's "needs and objectives." (Dkt. 45-2 at ¶ 76; Dkt. 45-27; Dkt. 48 at ¶ 52). Specifically, Elliott felt that Mortimer "ha[d] a variety of experience that w[ould] transfer properly to RIT campus," "thinks outside the box," and has a "background with [Historically Black Colleges and Universities ("HBCU")] and [Predominantly White Institutions]." (Dkt. 45-27). Another candidate Elliott screened was Laura Bronsink, a Caucasian woman. (Dkt. 45-2 at ¶ 77; Dkt. 45-27). Elliott's notes on Bronsink identified her as the other of the top two candidates, adding that she had a "positive initial interview" and had "[g]ood experience and prior conflict resolution work." (*Id.*).

Following Elliott's screening, the search committee held interviews with the candidates. Dr. Boulais indicated that the search committee's top three candidates were Mortimer, Bronsick, and Plaintiff. (Dkt. 45-31). Plaintiff served almost ten years as the Associate Director for the Center of Student Conflict and Conflict Resolution at RIT. (Dkt. 45-2 at ¶ 81; Dkt. 48 at ¶ 70; Dkt. 47-9). Before that, she served as Assistant Director for

the Center for Student Conflict Management at the University of Rochester. (*Id.*). Plaintiff was the only candidate that was fluent in American Sign Language. (Dkt. 48 at ¶ 103). Mortimer served as Director of Residential Life and Education at Saint Augustine's University. (Dkt. 45-2 at ¶ 78; Dkt. 45-28). Before that he served as Associate Director of Residence Life at Onondaga Community College, which involved responsibilities concerning Title IX and student conduct. (Dkt 45-2 at ¶ 79; Dkt. 45-28). Bronsink served as Dean of Students at Roberts Wesleyan College, where she supervised the Department of Student Conduct. (Dkt. 45-2 at ¶ 80; Dkt. 45-29). Before that she served as the Director of Student Conduct and Community Standards and Associate Director of Residence Life at Indiana Wesleyan University. (*Id.*).

Defendant brought these three candidates to campus for all-day interviews. (Dkt. 45-2 at ¶ 84; Dkt. 48 at ¶¶ 77-78). Dr. Boulais—in reference to the all-day interviews—reportedly told the search committee that they "weren't only going to bring two white women to campus and not bring this black man." (Dkt. 45-2 at ¶ 85; Dkt. 48 at ¶ 83). Part of the all-day interview process included an interview with "campus partners"—that is, other RIT faculty and staff. (Dkt. 59-49 at ¶ 84). Bronsink was the first to complete the all-day interview, meeting with 15 campus partners on June 3, 2022. (Dkt. 45-2 at ¶ 86). Bronsink received positive and negative feedback from the campus partners. (Dkt. 45-2 at ¶ 86; Dkt. 45-32). Some campus partners commented that she "answered all questions perfectly," "shares similar philosophy to [RIT's] conduct department," and "[h]as a strong set of transferrable experiences at multiple universities." (Dkt. 45-32). Others felt that her "approach to conduct is not conducive to the RIT environment," that she "does not have

the leadership background at this time to lead a larger office at the pace [RIT's] student conduct office runs at daily," and that they are "[n]ot sure she is ready to take on the Director role at this time." (*Id.*).

Plaintiff met with 14 campus partners on June 9, 2022. (Dkt. 45-2 at ¶ 87). Plaintiff also received positive and negative feedback. (Dkt. 45-2 at ¶ 87; Dkt. 45-33). Campus partners felt that Plaintiff brought "extensive experience . . . at RIT," "had a well thought out vision for the department and demonstrated a plan to get there," and had "[s]trong . . . understanding of the role of humanity, community safety, development and restorative justice in the student conduct process." (*Id.*). Some campus partners said they had no concerns about Plaintiff's ability to take on the Director role, while others said that she did not show enough "examples of how she would lead the department in change and improvement" and were "disappointed that [they] never saw any attempts at" the changes she spoke about in her interview "while she was in her current role." (Dkt. 45-33). Several campus partners noted that an internal candidate like Plaintiff "may have a bit more difficulty seeing the team from a fresh perspective" and could "breed stagnation or complacency." (*Id.*). The day after the interview, Dr. Boulais held Plaintiff's annual performance review. (Dkt. 45-2 at ¶ 88). There, Plaintiff told Boulais that if she was not selected as Director she would quit. (Dkt. 45-2 at ¶ 88; Dkt. 45-9 at 53-54).

Finally, Mortimer met with 12 campus partners on June 13, 2022. (Dkt. 45-2 at ¶ 89). As with the first two candidates, the campus partners had both positive and negative feedback about Mortimer. (Dkt. 45-2 at ¶ 87; Dkt. 45-34). The campus partners felt that Mortimer's strengths included his "[r]estorative background and understanding of various

areas restorative practices could be implemented," that he "was knowledgeable about the different considerations for the Conduct office," that he "seems like he is good at leading a team," and "has been a director" before. (*Id.*). However, several campus partners felt that he had "limited student conduct experience" and lacked "experience with managing or adjudicating conduct proceedings." (*Id.*). One noted that "given the size of RIT's student body, the volume, and the complexity of cases" they were "concerned that this position would be too much of a stretch [for Mortimer] at this time." (*Id.*).

Before finding out who was selected for the role, on June 22, 2022, Plaintiff sent a text to Graupman which said: "I am waiting any day to be told I didn't get the director job and then I'm leaving." (Dkt. 45-2 at ¶ 90).

Dr. Boulais made the final decision to hire Mortimer, believing that he was the strongest candidate. (Dkt. 45-2 at ¶ 93; Dkt, 48 at ¶ 92). Dr. Boulais felt that Mortimer was "someone who could articulate the most positive forward-looking vision for the office that included a restorative justice framework." (Dkt. 45-2 at ¶ 94; Dkt. 48 at ¶ 95). She added that he "was able to clearly articulate . . . work that he had done, and work that he would do" and had "direct experience that he was able to speak to from the administrative level, budget experience, previous supervision, coordinating between other offices, collaborating work[ and] . . . director level experiences that . . . made him the strongest candidate for the position." (Dkt. 45-9 at 51-52). Dr. Boulais acknowledged Mortimer did not have the most student conduct experience of the final candidates. (Dkt 45-2 at ¶ 95).

Dr. Boulais decided not to select Plaintiff because there was concern about her ability to learn and grow in the department given how long she had worked there. (*Id.* at

¶ 97). Dr. Boulais felt that Plaintiff's interviews focused more on what she had achieved as Associate Director without discussing the leadership responsibilities of the Director position. (*Id.*). Dr. Boulais based her decision, in part, on her years-long experience working with Plaintiff in the Student Conduct department. (*Id.* at ¶ 98). More specifically, Dr. Boulais cited specific events that she felt showed that Plaintiff was not right for the role: (1) Plaintiff incorrectly formatted a draft presentation she prepared for a University Council meeting—that is, a meeting for faculty, staff, and student governing groups; and (2) Plaintiff failed to report specific concerns that she had about a colleague in a feedback meeting, which Dr. Boulais believed showed a lack of leadership skills. (Dkt. 48 at ¶¶ 108-114). Dr. Boulais called Plaintiff to inform her of the hiring decision. (Dkt. 45-2 at ¶ 99). During that call, Dr. Boulais mentioned that the selected candidate had expertise and was coming to RIT from an HBCU. (*Id.*).

On July 6, 2022, Plaintiff provided two days' notice for her resignation from RIT and officially resigned on July 8, 2022. (*Id.* at ¶ 102). Plaintiff filed a claim with the EEOC on January 6, 2023. (Dkt. 9 at 80).

## **DISCUSSION**

### I. **Summary Judgment Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the non-moving party, it finds that no rational jury could find in

favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Where, as here, there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II. Race and Gender Discrimination Claims

Both parties move for summary judgment on Plaintiff's claims for race discrimination pursuant to Title VII and the NYSHRL. Defendant also moves for summary judgment on Plaintiff's claims for gender discrimination under Title VII, Title IX and the NYSHRL.

Pursuant to Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Discrimination claims brought pursuant to Title VII, Title IX, and the NYSHRL are analyzed under the *McDonnell Douglas* burden-shifting framework. *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019) ("We have . . . long interpreted Title IX by looking to the . . . caselaw interpreting Title VII) (internal quotation marks omitted). Under this standard, the initial burden is on Plaintiff to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If Plaintiff is able to establish a prima facie case, the burden shifts to Defendant to show a legitimate, non-discriminatory reason for its employment decision. *Id.* Finally, if Defendant makes this showing, the burden shifts back to Plaintiff to establish that the non-discriminatory rationale offered by Defendant was pretext for discrimination. *Id.*

### A. Race Discrimination Claims Under Title VII and the NYSHRL

#### 1. Prima Facie Case

To establish a claim of racial discrimination, a plaintiff must show: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150 (2d Cir. 2012) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). Plaintiff's prima facie showing need only be "de minimis." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). In order to be successful on a failure to promote claim, a plaintiff must show that she "applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (quotation omitted).

Defendant concedes that Plaintiff belongs to a protected class and that she applied for and was qualified for the Director position. However, it argues that Plaintiff cannot establish a prima facie case for race discrimination because there is no evidence to create an inference of discrimination. (Dkt. 45-1 at 28). In other words, Defendant argues that there is no evidence that Plaintiff was not hired because of her race. (*Id.*). "Inference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios. . . . An inference of discrimination can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action, or by showing that an employer treated an employee less favorably than a similarly situated employee outside his protected group." *Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 532 (W.D.N.Y. 2016) (citation modified). However, "an employer's stated desire for diversity in the workplace does not, without more, establish discriminatory intent with respect to any particular employment decision." *Village of Freeport v. Barrella*, 814 F.3d 594, 614 (2d. Cir. 2016). Indeed, Plaintiff concedes that diversity is a legitimate objective in hiring practices. (Dkt. 46-1 at 19).

A plaintiff can satisfy her burden at this stage where the employer treated her less favorably than a similarly situated employee outside of her protected group. *See Leviant v. City of New York Human Resources Admin.*, 625 F. Supp. 2d 85, 102 (E.D.N.Y. 2008) ("an inference of discrimination may be found where the position was filled by someone not a member of plaintiff's protected class."). Here, the fact that Mortimer, a black male, was hired for the Director position when Plaintiff was identified as the most qualified candidate for the position is sufficient to support a showing of discriminatory intent at this stage. *See Yu v. N.Y. City Hous. Dev. Corp.*, 494 F. App'x 122, 125 n.4 (2d. Cir. Aug. 28, 2012) (prima facie burden to show discriminatory intent can be "established if the employer fills the position with a person outside the protected class who was similarly or less qualified than the plaintiff" (citation modified); *see also Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis."). In addition, Plaintiff

highlights RIT's emphasis on race-based selection criteria in making its hiring decision to further support this inference.

Taken together, the Court concludes that a reasonable jury could find that the circumstances support an inference of discrimination and that Plaintiff has met her burden of establishing the requisite elements of a prima facie case of race discrimination against RIT.

### 2. Legitimate, Non-Discriminatory Reasons

RIT contends that even if Plaintiff could establish a prima facie claim of race discrimination, her claims are subject to dismissal because Defendant had a legitimate nondiscriminatory reason for not selecting Plaintiff for the position. Plaintiff challenges the legitimacy of Defendant's proffered reasons and contends that the Court can conclude as a matter of law that the reasons were illegitimate.

"The threshold for establishing a legitimate non-discriminatory reason is not high. *Wall v. Chater Communs., Inc.*, 19-CV-06387-EAW, 2022 WL 4095840, at *10 (W.D.N.Y. Sept. 7, 2022); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) ("The defendant need not persuade the court that it was actually motivated by the proffered reason[]. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981))). "The employer's explanation of its reasons [for not promoting] must be clear and specific." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985).

Defendant explains that it determined Mortimer was the strongest candidate for the position because he had "the most positive, forward-looking vision for the office that

included the restorative justice framework." (Dkt. 45-1 at 31). In addition, unlike Plaintiff, Mortimer already served in a director-level role, and Mortimer "was able to speak to budget experience, previous supervision, and collaboration and coordination between other offices." (*Id.*).

Defendant also offers several reasons why it did not hire Plaintiff. First, Dr. Boulais felt that Plaintiff's interviews focused more on what she had achieved in the past without discussing how she would take on the Director position. (Dkt. 62 at 16). This reasoning is in line with Dr. Boulais's preference for Mortimer's "forward thinking" approach to the role. Additionally, Dr. Boulais cited two incidents during Plaintiff's tenure as Associate Director that factored into her decision not to hire Plaintiff: (1) she incorrectly formatted a draft presentation for a University Council meeting; and (2) she failed to report specific concerns about a colleague in a feedback meeting which showed a lack of leadership skills. (Dkt. 48 at ¶¶ 108-114).

At this stage, the Court is satisfied that Defendant has sufficiently articulated legitimate, non-discriminatory reasons for its decision to hire Mortimer and not hire Plaintiff.

**3. Pretext**

Because Defendant offered legitimate, non-discriminatory reasons for not hiring Plaintiff, the burden shifts back to Plaintiff to show those reasons were pretext.

A plaintiff may show pretext "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (quoting *Burdine*, 450 U.S. at 256). Such showing may be made "by demonstrating

weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate . . . reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* "[I]f the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (citation omitted).

Here, there are numerous factual disputes between the parties preventing resolution on a summary judgment motion of whether Defendant's determination was pretext for race discrimination.

For example, Plaintiff argues that Defendant's "search and hiring process here explicitly focused on and contained unlawful, race-based selection criteria" and "unreasonably disregarded both, significant concerns about Mr. Mortimer's qualifications and overwhelming support for Dr. Ecock-Rotondo." (Dkt. 46-1 at 17). She contends that she is entitled to summary judgment and that the Court can conclude as a matter of law that the reasons offered by RIT were mere pretext. But much of the information Plaintiff cites regarding Defendant's search and hiring process is simply related to the school's commitment to diversity. University and departmental policies promoting diverse hiring, standing alone, do not equate to unlawful selection criteria.

Plaintiff contends that Defendant's emphasis on diversity, paired with the fact that the Director search did not follow typical RIT hiring procedures, satisfies her burden and

establishes that the search process was tainted from the outset. (Dkt. 46-1 at 20). For example, she notes that Elliott, who had never participated in a search for the Student Conduct office, was included in this search "specifically to advance diversity hiring goals." (*Id.*). But Plaintiff provides no support for the claim that Elliott was only included in this search for the specific goal of hiring a diverse candidate. And it is not inherently suspect that a Human Resources employee—namely, the Assistant Director of Talent Acquisition & Staff Diversity Outreach—be involved in a search, or that diversity be one of his priorities. Additionally, Elliott's involvement focused on the first phase of the interview process, where he conducted the initial screening of the candidates and does not provide conclusive evidence of Plaintiff's claims.

Plaintiff argues that Elliott's involvement becomes more concerning due to his use of a new ranking chart which included "diversity metrics." (Dkt. 46-1 at 20; Dkt. 45-27). This chart contained the basic information of all candidates that Elliott screened, including their contact information, current employer and title, pay expectation, and whether they fulfill any diversity metrics—that is, indicating whether they are female or a racial minority. (Dkt. 45-27). But as Plaintiff concedes, there are many permissible reasons that Human Resources may collect demographic data. (Dkt, 46-1 at 20). Plaintiff contends that Elliott wrongly shared this information with Dr. Boulais, when it was against Human Resources policy to provide such information to hiring managers. (*Id.*). Defendant counters that Elliott provided Dr. Boulais his notes on the candidates because she was a member of the search committee. (Dkt. 63 at ¶ 18). Defendant also adds that RIT does not have strict hiring policies forbidding such sharing of information. (*Id.*).

To further support her argument that Defendant impermissibly factored race into the hiring process, Plaintiff points to Dr. Boulais's comment that she was "not going to bring just two white women to campus" for interviews "and not bring this black man." (Dkt. 46-1 at 21). Plaintiff maintains that this comment shows that the reasons given not to hire Plaintiff were pretextual. (*Id.* at 21-22). Defendant counters that this comment as "merely a 'stray remark,' which does not constitute sufficient evidence to support a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).

Plaintiff argues that Defendant's stated reasons for hiring Mortimer were pretext because they hired him "despite his clear lack of required qualifications and experience." (Dkt. 46-1 at 21). But as described above, the Director position contained several minimum qualifications including a master's degree in higher education or a related field; six-years of experience in managing student conduct or related work; and experience involving areas including leadership, budgeting, working with a diverse group, and knowledge of American Sign Language or a willingness to learn (Dkt. 45-18), and Mortimer has a Master's degree in Higher Education, served in a director-level role for two years before applying to RIT, and had several more years of experience as an Associate Director and Complex Director of Residence Life (Dkt. 45-28).

Plaintiff takes issue with Mortimer's lack of experience in student conduct, noting that his experience mostly involved residence life which she says is "significantly different from student conduct." (Dkt. 46-1 at 13). She argues that Defendant's reliance on Mortimer's experience working at an HBCU is irrelevant and further evidence of its use of unlawful practices. (Dkt. 46-1 at 20). But there is no evidence that resident life is wholly

irrelevant experience. (Dkt. 62 at 14). Defendant notes that Mortimer's resume indicates that his residence life roles involved student conduct responsibilities, such as work as a Tile IX coordinator and Title IX investigator, "certified through SUNY Student Conduct Institute"; experience as a "level-5 Maxient Administrator responsible for[] managing all aspects of tracking cases for student conduct"; and work supervising hall directors on student conduct case management. (Dkt. 62 at 14; Dkt, 45-28). And it was an explicit job requirement to have experience working with a diverse student body. (Dkt. 45-18).

To the extent Plaintiff challenges Mortimer's qualifications compared to her own, (Dkt. 46-1 at 12), "Title VII does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision . . . not be discriminatory." *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir. 1980). "Employers should be free to choose the person that they honestly (even if erroneously) consider the better-qualified candidate without being subjected to liability merely because the two candidates are of a different race." *Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 320 (W.D.N.Y. 1999). Indeed "[a]n employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001). And "there is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview." *Id.* at 104.

"When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's

explanation was pretextual, but that the pretext served to mask unlawful discrimination." *Id.* at 103. On a motion for summary judgment, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Id.* (quoting *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999)).

As is evident from the foregoing, there exist numerous genuine and material factual issues as to whether RIT's stated reasons for not hiring Plaintiff were pretextual. On this record, the Court cannot conclude that no reasonable jury could find in favor of Defendant; on the other hand, the Court cannot conclude the opposite. Accordingly, summary judgment is not warranted for either party on Plaintiff's claim for race discrimination. *Boubacar v. Buffalo Fine Arts Acad.*, No. 17-CV-00016-LJV-HKS, 2024 WL 4884381, at *13 (W.D.N.Y. Oct. 31, 2024) ("Such differing interpretations of facts, many which are material and disputed, are for a jury. . . . In sum, the Court concludes that a reasonable jury could find that [plaintiff's] race and/or national origin were 'motivating factors' in his demotion and termination. . . . Summary judgment is thus inappropriate."), *report and recommendation adopted*, 2024 WL 4882262 (W.D.N.Y. Nov. 25, 2024).

### B. Gender Discrimination Claims Under Title VII, Title IX and the NYSHRL

As an initial matter, Defendant contends that most of Plaintiff's Title IX claim for gender discrimination is untimely. (Dkt. 45-1 at 25). The Second Circuit applies a three-year statute of limitations on Title IX cases. *Purcell v. New York Inst. of Tech.*, 931 F.3d

59, 63 (2d Cir. 2019). Accordingly, Defendant argues that all events relevant to the Title IX claim must have occurred on or after March 21, 2020, to be considered timely. (Dkt. 45-1 at 25). Plaintiff acknowledges that her claims relate to the time period between 2018 and 2022, and notes two events that occurred after March 21, 2020: (1) Newell's comment to Plaintiff that she looked manic and crazy, which allegedly occurred in October 2020, and (2) Defendant's decision to not hire Plaintiff for the Director position in 2022. (Dkt. 58 at 30).

Here, as a practical matter, Plaintiff's initial allegations of gender discrimination involved alleged acts and statements by Newell, who as explained above, was not involved in the determination not to promote Plaintiff to the Director position. In other words, the alleged acts taken by Newell in 2018 and 2019 that could conceivably constitute Plaintiff's complaints of gender discrimination did not occur during the relevant limitations period. Further, failure to promote claims are "discrete acts," and generally are not subject to the continuing violation doctrine. *See Haxhijaj-Sayegh v. City of Yonkers*, No. 24-CV-3622 (NSR), 2026 WL 880644, at *4 (S.D.N.Y. Mar. 30, 2026). Accordingly, the Court agrees with RIT that Plaintiff's allegations that occurred prior to March of 2020 cannot sustain her claims under Title IX as they relate to her failure to promote claim.

Moreover, even if those pre-March 2020 allegations were timely, Defendant argues that Plaintiff cannot establish a prima facie case specifically as it relates to her gender discrimination claims because she cannot articulate any adverse employment action that she experienced on the basis of gender. (Dkt. 45-1 at 25). Plaintiff does not refute this argument in her opposition to Defendant's motion.

Further, to the extent Plaintiff alleges a claim that the failure to promote her to the Director position was tied to gender discrimination, unlike her race discrimination claims, the record does not support a finding that Plaintiff could satisfy her burden of establishing a prima facie case of gender discrimination, and as discussed further below, alternatively any such prima facie case is so weak that it ultimately fails under the third step of the *McDonnell Douglas* test. Other than the fact that the individual hired for the position was male, Plaintiff provides no other specific information to support an inference of discrimination on the basis of her gender or that RIT's hiring determination had any relation to Plaintiff's gender. And even if that fact could satisfy her prima facie burden, as set forth above, Defendant has established legitimate nondiscriminatory reasons for selecting Mortimer over Plaintiff for the Director position. While Plaintiff developed sufficient evidence to support a conclusion that a reasonable factfinder could find that the failure to select Plaintiff for the Director position was a pretext for race discrimination, the Court does not reach a similar conclusion with respect to her gender discrimination claim, which is unquestionably thin and wholly conclusory. Plaintiff does not tie any of RIT's specific reasons for decision-making to her gender.

Considering all of the evidence, the Court concludes that even if Plaintiff had sufficient evidence of gender discrimination to reach the third step of the *McDonnell Douglas* test, the proof is insufficient for a reasonable jury to conclude that Plaintiff's gender played any role in the determination not to select her for the Director position. *See, e.g., James v. Port Auth. Police Dep't*, No. 22 CIV. 2463 (PGG), 2025 WL 966016, at *13 (S.D.N.Y. Mar. 31, 2025) (granting summary judgment on failure to promote claim where

"Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether Defendants' alleged nondiscriminatory reason for not promoting him is pretextual" or "offered evidence sufficient to create a material issue of fact as to whether Defendants' alleged reason for not promoting Plaintiff is a pretext"); *Rinaldi v. Nice, Ltd.*, No. 19 CIV. 424 (LGS), 2021 WL 827767, at *6-7 (S.D.N.Y. Mar. 4, 2021) (where prima facie case of discrimination was weak, plaintiff could not overcome employer's proffered legitimate, nondiscriminatory reason for termination).

In sum, when all the evidence is viewed as a whole in the light most favorable to the non-moving party, the Court concludes that Plaintiff has established a *prima facie* case of race discrimination pursuant to Title VII and NYSHRL, and there are genuine issues of material fact concerning whether Defendant's cited reasons for not hiring Plaintiff were pretextual, requiring summary judgment to be denied for both parties on this claim. The same is not true for her claims of gender discrimination and Defendant's motion for summary judgment on these claims is granted.

## III. Retaliation Under the ADA and NYSHRL

Defendant also seeks summary judgment on Plaintiff's claim for disability retaliation in violation of the ADA and NYSHRL. (Dkt. 45-1 at 18). As the Second Circuit explained:

> The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

*Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). The NYSHRL contains similar provisions and is generally "governed in this respect by the same standard as the ADA." *Id.* Claims for retaliation under the ADA and NYSHRL "are analyzed under the same burden-shifting framework established for Title VII cases." *Id.*

Specifically, to establish a prima facie case of retaliation, a plaintiff must establish that (1) she participated in protected activity under the ADA; (2) defendant was aware of the protected activity; (3) an adverse employment action was taken; and (4) there exists a causal connection between the alleged adverse action and the protected activity. *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021). If a plaintiff can establish a prima facie case, the burden shifts to a defendant to come forward with a legitimate non-retaliatory reason for the adverse action. *Id.* If a defendant meets that burden, the plaintiff must "adduce evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* (citation modified)).

**A. ADA Claim**

As an initial matter, Defendant argues that the majority of the discrete acts Plaintiff points to in support of her claim for her ADA disability retaliation cannot be considered because they are untimely. (Dkt. 45-1 at 19). Under the ADA, a plaintiff must file a charge of retaliation with the EEOC within 300 days of the alleged retaliatory act. *See Valtchev v. City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010). Plaintiff filed with the EEOC on January 6, 2023. (Dkt. 9 at 80). March 12, 2022, was 300 days prior to that date.

Defendant argues that the only event Plaintiff cites that falls within the 300-day window is RIT's decision to not hire Plaintiff as Director. (Dkt. 45-1 at 20).

Plaintiff does not dispute that the 300-day limitations period applies but argues that the continuing violation doctrine allows the discrete acts her claim relies on that occurred before March 2022 to be considered. (Dkt. 58 at 17-18).[2] "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice." *Barzman v. State Univ. of New York*, No. 3:22-CV-00367 (TJM/ML), 2023 WL 2346265, at *4 (N.D.N.Y. Mar. 3, 2023) (citation modified)). But not only is the doctrine "heavily disfavored by the Second Circuit," *Trinidad v. New York City Dep't of Correction*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006), it is largely inapplicable to retaliation claims. *Staten v. City of New York*, 726 F. App'x 40, 43 (2d Cir. 2018) ("[T]he [continuing violation] doctrine does not apply to discrete acts of discrimination or retaliation, such as termination, failure to promote, denial of transfer or refusal to hire" (citation modified)); *Ashleigh v. Mount Sinai Hosp.*, No. 25-CV-6171 (JPO), 2026 WL 1133711, at *4 (S.D.N.Y. Apr. 27, 2026) ("[T]he 'continuing violation' doctrine applies only to harassment claims, and is inapplicable to discrimination and retaliation claims." (citation modified)); *Bender*

---

[2] Defendant urges the Court to reject Plaintiff's arguments regarding the continuing violation theory in light of the fact that she raises it for the first time in opposition to summary judgment. (Dkt. 64 at 4). Because the Court concludes that the doctrine does not serve to save the claims, it need not consider whether it was appropriately raised.

*v. United States Postal Service*, No. 21-CV-924-LJV, 2024 WL 406324 at *7 (W.D.N.Y. Feb. 2, 2024) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges[.]' . . . In other words, because "[e]ach discrete discriminatory [or retaliatory] act starts a new clock for filing charges alleging that act,' the continuing violation doctrine does not apply to discrimination or retaliation claims." (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002)); *see also Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 299 (S.D.N.Y. 2012) (failure to promote claims are not subject to the continuing violation doctrine). Because Plaintiff has not established that the continuing violation doctrine is applicable to her claims, the Court agrees with Defendant that the only event Plaintiff can timely rely on to sustain an ADA claim is the 2022 hiring decision.

Plaintiff cannot sustain an ADA retaliation claim in connection with that determination. Plaintiff's ADA retaliation claims arise from her advocacy for Beattie and Newell's resulting anger and hostility, but even assuming they constitute protected activity of which Defendant was aware, these allegations have no apparent relation to Defendant's decision not to hire Plaintiff as Director, particularly when Newell played no role in the Director search and was not even employed by RIT when the decision was made. (Dkt. 45-2 at ¶ 35; Dkt. 59-49 at ¶ 35). Plaintiff has not adduced any material evidence that creates a genuine issue of fact connecting the two. Thus, the failure to establish a causal connection between protected activity and adverse employment action is fatal to Plaintiff's prima facie case for purposes of an ADA claim. *Greco v. Cnty. of Nassau*, 146 F. Supp. 2d 232, 244 (E.D.N.Y. 2001) ("Where a plaintiff fails to point to admissible evidence

establishing the requisite causal connection, summary judgment in favor of the defendant is appropriate."). Accordingly, Defendant's motion for summary judgment is granted with respect to Plaintiff's claim for disability retaliation under the ADA.

**B. NYSHRL Claim**

Plaintiff also brings a disability retaliation claim under the NYSHRL (Dkt. 58 at 17), which has a three-year statute of limitations. *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 248-49 (E.D.N.Y. 2012) (citing N.Y. C.P.L.R. 214(2)), *aff'd*, 713 F.3d 163 (2d Cir. 2013). Under the three-year limitations the Court may consider actions that occurred after March 21, 2020. Plaintiff provides a list of various events which she believes are relevant to her disability retaliation claim, (Dkt. 58 at 19), but very few of these events occurred after March 21, 2020. The Court analyzes Plaintiff's claim for NYSHRL disability retaliation with emphasis on the timely events.

Retaliation claims under the NYSHRL are generally evaluated under the same standard as ADA retaliation claims under the *McDonnell-Douglas* framework. *Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023).

**1. Protected Activity**

Plaintiff argues that her requests for accommodations on Beattie's behalf constitute protected activity of which Defendant was aware. (Dkt. 58 at 20-21). While requests for accommodations may arguably be sufficient to constitute protected activity under the ADA, *Pepe v. Cnty. of Suffolk*, No. 22-CV-03058-GRB-AYS, 2025 WL 2549986, at *5 (E.D.N.Y. Sept. 4, 2025) ("Requests for accommodation and even informal complaints of discrimination qualify as protected activity under the ADA."); *Flieger v. E. Suffolk*

*BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017) ("Activities protected by the ADA include complaints of ADA discrimination . . . and requests for reasonable accommodation."), the same is not necessarily true under the NYSHRL, *see Konyukhova v. Walgreen Co*., No. 24-CV-4390, 2026 WL 880381, at *10 (S.D.N.Y. Mar. 31, 2026) ("[u]nlike the ADA and NYCHRL, NYSHRL does not recognize a request for accommodation as a protected activity"); *Guerrero v. Constellation Health Servs*., LLC, No. 22-CV-07736 (OEM)(LGD), 2025 WL 2549936, at *15 (E.D.N.Y. Sept. 4, 2025) ("Plaintiff's NYSHRL-based retaliation claim must be dismissed as a matter of law because New York intermediate appellate courts held that "under [NYSHRL], a request for reasonable accommodation is not a protected activity for purposes of a retaliation claim."); *Medina v. AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 347 (S.D.N.Y. 2024) ("[T]he Court concludes that Plaintiff cannot rely on her requests for reasonable accommodations as protected activity in connection with her NYSHRL retaliation claim. . . ."). However, to the extent that Plaintiff also contends that her complaints to and criticism of Newell for her unfair and discriminatory treatment towards Beattie with respect to his disability constitute protected activity, *Hamilton v. Siemens Healthcare Diagnostics, Inc.*, No. 23-CV-7408 (KMK), 2026 WL 880547, at *11 (S.D.N.Y. Mar. 31, 2026) (complaints about discriminatory employment practices can constitute protected activity), the Court will consider the other elements of a prima face showing.

**2. Adverse Action**

For an NYSHRL claim, Plaintiff must also establish that "something happened that was reasonably likely to deter a person from engaging in protected activity." *Florence v.*

*72and Sunny Partners LLC*, No. 25-CV-7082 (LJL), 2026 WL 2254417, at *25 (S.D.N.Y. Aug. 5, 2026).

Plaintiff characterizes the following as adverse actions occurring after March 21, 2020: (1) after Plaintiff suggested Newell communicate with Beattie via an online messaging platform, Newell got so angry that she turned red and balled her fists; (2) Newell's removal of Plaintiff's supervisory role and posting of a chart reflecting such change; and (3) the failure to hire Plaintiff for the director position. (Dkt. 58 at 22-24).

The Court agrees with Defendant that Newell's anger does not rise to the level of Plaintiff's necessary showing, as it is more akin to "minor inconveniences" and "petty annoyances," that cannot sustain a retaliation claim. *Itwaru v. New York City Dep't of Health & Mental Hygiene*, No. 1:24-CV-02020 (JHR) (SDA), 2025 WL 2933591, at *8 (S.D.N.Y. July 29, 2025) ("However, conduct still must 'transcend petty slights or trivial inconveniences' to be actionable under . . . [the] NYSHRL."), *report and recommendation adopted*, 2025 WL 2555970 (S.D.N.Y. Sept. 5, 2025). While RIT contends that the change in supervisory responsibilities did not impact Plaintiff's compensation or career trajectory, Plaintiff has adequately contended that this action, which constituted diminished job responsibilities, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (holding that "a less distinguished title" or "significantly diminished material responsibilities" could constitute adverse action for purposes of prima facie case), was sufficient for purposes of the requisite showing on a summary judgment motion. Further, Defendant does not contest that the failure to promote Plaintiff to Director was an adverse action.

**3. Causal Connection**

Concluding that the removal of supervisory responsibilities and failure to promote are actionable does not end the analysis. There still must be a causal connection between Defendant's actions and Plaintiff's protected activities in order to sustain a prima facie case. "A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Tafolla*, 80 F.4th at 125-126 (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)). Recently, the Second Circuit said that "courts uniformly hold that the temporal proximity must be very close, which usually means less than three or four months." *Gehlaut v. N.Y.C. Dep't of Educ.*, No. 24-1741, 2025 WL 2586770, at *6 (2d Cir. Sept. 8, 2025).

Here, with respect to the removal of supervisory duties, the only arguable protected activity that falls within the statute of limitations occurred when Plaintiff advocated for Beattie and encouraged Newell to communicate with him through the online messaging platform so that he would not feel "left out," which does not have a specific date but occurred after December 2020. (Dkt. 58 at 23; 59-47). Yet according to Plaintiff, the removal of Plaintiff's supervisory responsibilities over Beattie predated this protected act and therefore, Plaintiff cannot establish the requisite causal connection to sustain a claim based on this particular conduct.

Similarly, Plaintiff has not established any causal connection between any of her purportedly protected acts and RIT's June 2022 decision to select someone other Plaintiff for the Director position. Plaintiff's complaints of retaliation focus almost exclusively on

Newell, who was not involved with that determination in any respect, and are too remote in time to support an inference of causation. Plaintiff's attempts to bootstrap her untimely allegations against Newell into a claim against Boulais cannot sustain her burden at summary judgment.

In sum, even construing the evidence in the light most favorably to Plaintiff, Plaintiff fails to establish a causal connection between the only timely protected activity and the adverse employment actions she experienced in order for a rational jury to find that Defendant retaliated against her.

**4. Legitimate Nondiscriminatory Reasons and Pretext**

Further, even if the Court were to conclude that Plaintiff had established a prima facie case of disability retaliation under the NYSHRL, as addressed herein, Defendant has come forward with legitimate nondiscriminatory reasons for the decision not to select Plaintiff for the Director position. As to the change in supervisory status, Defendant argues that the change in the organizational structure was more effective for the Department and allowed Newell to have more direct communication with Beattie to improve the relationship. These constitute adequate reasons to sustain Defendant's burden. And Plaintiff has not come forward with timely evidence to demonstrate that any of those reasons were pretext for disability retaliation. *Garrison v. Am. Sugar Ref., Inc.*, 789 F. Supp. 3d 291, 312 (S.D.N.Y. 2025) (granting summary judgment to defendant where plaintiff did not put forth evidence suggesting that the stated business reasons were pretext for discrimination).

Accordingly, Defendant's motion for summary judgment on the issue of disability retaliation is granted.

## IV. <u>Breach of Contract</u>

Finally, Defendant moves for summary judgment on Plaintiff's breach of contract claim, noting that Plaintiff's counsel advised at Plaintiff's deposition that Plaintiff would not oppose a summary judgment motion on that claim. (Dkt. 45-1 at 32). Indeed, Plaintiff did not oppose Defendant's summary judgment motion on the breach of contract claim. (Dkt. 58).

"[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 20 (E.D.N.Y. 2020) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)). The Second Circuit has noted that because summary judgment 'is known as a highly useful method of narrowing the issues for trial,' it follows that 'preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses,'" and that a party's decision to pursue only some claims permits a court to infer that any claims not defended are abandoned. *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016).

Plaintiff having abandoned her breach of contract claim, Defendant's motion for summary judgment on this claim is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 45) is granted in part and denied in part. More specifically, Defendant's motion for summary judgment is denied on the claims for race discrimination, but granted on the claims for gender discrimination, disability retaliation, and breach of contract. Plaintiff's motion for summary judgment (Dkt. 46) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 4, 2026
Rochester, New York